516 F.2d 1081
 3 O.S.H. Cas.(BNA) 1166, 1974-1975 O.S.H.D. ( 19,684
 ANNING-JOHNSON COMPANY and Workinger Electric, Incorporated,
Petitioners,
v.
UNITED STATES OCCUPATIONAL SAFETY AND HEALTH REVIEW
COMMISSION and Peter J. Brennan, Secretary of
Labor, United States Department of
Labor, Respondents.
 Nos. 74-1381, 74-1382.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 19, 1975.
Decided May 27, 1975.
 
 John A. Jeffries, Steven H. Adelman, Chicago, Ill., for petitioner.
 McNeill Stokes, Atlanta, Ga., for amicus curiae.
 Carla A. Hills, Asst. Atty. Gen., Judith H. Norris, Atty., App. Section, Civ. Div., Dept. of Justice, Washington, D. C., for respondents.
 Before STEVENS, SPRECHER and TONE, Circuit Judges.
 SPRECHER, Circuit Judge.
 
 
 1
 The single narrow issue in this appeal is whether subcontractors working at a multi-employer construction site can receive citations and be held liable for penalties under the Occupational Safety and Health Act of 1970,29 U.S.C. § 651 et seq. (OSHA), for non-serious violations of standards promulgated by the Secretary of Labor to which their employees were exposed, but which the subcontractors neither created nor were responsible for pursuant to their contractual duties.
 
 
 2
 * Wright Construction Company, Inc. was the general contractor for the construction of a five-story steel and concrete bank building at Elkhart, Indiana. Petitioner Anning-Johnson Company was a subcontractor on the project with responsibility for furnishing and installing fireproofing for the building. Petitioner Workinger Electric, Inc. was a subcontractor on the same construction site with responsibility for furnishing and installing electrical, plumbing and sheet metal work. Neither subcontractors' contract contained a description of their duties which included general construction or carpentry work.
 
 
 3
 On May 31, 1973, an Occupational Safety and Health Administration compliance officer inspected the construction site. At the time of the inspection Anning-Johnson employed four employees on the jobsite who were members of Plasters Local 46, Cement Masons Local 532 and Laborers Local 645. Workinger employed fifteen employees at the construction site who were members of Electrical Workers Local 153, Plumbers Local 278 and Sheet Metal Workers Local 164.
 
 
 4
 It was stipulated that at the time of the inspection that the five floors and the roof of the building were already in place. The walls of the building were not in place and each floor was open at the side and was more than six feet above the adjacent floor and ground level.
 
 
 5
 The inspector found that on each floor a single steel cable was strung tautly along the edges of the open-sided floor at a height of approximately 40 inches above the surface of the floor. The cable was affixed to vertical columns of the building which were along the edge of the floor, about 50 feet apart. Red ribbons were tied to the cable at various intervals. The cables were the only barrier along the edges of these open-sided floors. There were no intermediate rails in place. At the time of the inspection employees of both subcontractors worked near and at the edge of these open-sided floors.
 
 
 6
 Located in about the center of the interior of the building was a steel stairway running from the basement to the fifth floor. The stairway was approximately 42 inches wide and was open on both sides except for the presence on one side of the next higher flight of the stairway. Each flight of stairs had more than four risers. The stairway from the first to the fifth floor had a railing running along only one side in some areas and had no intermediate rails. Other areas had, on both open sides, a single railing without intermediate rails. The stairway was the only means of reaching the upper floors in the building and at the time of the inspection it was used by all employees to reach the various floors.
 
 
 7
 On each floor level there was a floor opening for an elevator shaft. The opening in the floor was a rectangle approximately 5 feet 111/2 inches by 16 feet 2 inches. On the fifth floor at the time of inspection the opening was guarded by a single wood rail running along the edges of the opening at a height of approximately 40 inches above the floor surface. There was no intermediate rail or toeboard along any of the four sides of the opening.[1] The opening on the third floor was covered by 4 foot by 8 foot plywood sheets which lay unsecured on top of 4 inch by 4 inch pieces of lumber running along the two sides of the opening. These plywood sheets were not installed so as to prevent accidental displacement.
 
 
 8
 Because of these conditions the OSHA inspector cited Wright[2] as well as both petitioners for non-serious violations of 29 C.F.R. §§ 1926.500(d)(1), 1926.500(b)(1) and 1926.500(e)(1).[3] A total fine of $150 against each subcontractor was assessed.[4]
 
 
 9
 It was further stipulated by the parties that neither subcontractor installed the cable, erected any of the railings, or placed the plywood sheets over the floor openings, but that these were installed by employees of Wright or other subcontractors who were members of Carpenters' Local 565 and Laborers' Local 645. Petitioners were not, however, specifically prohibited by the general contractor or by their contract with the carpenters' union from abating the alleged violations. Foremen of both subcontractors were aware of the conditions and nonetheless allowed their men to remain on the job.
 
 
 10
 The case was presented before the Administrative Law Judge on a theory that the Secretary of Labor's enforcement policy of citing subcontractors for non-serious violations of OSHA standards created by employees of other employers and which could not be effectively abated by the cited subcontractors was not authorized by the Act. On February 11, 1974, the Administrative Law Judge denied petitioners' motion for summary judgment and affirmed the citations issued and the proposed penalties. It is that decision which petitioners seek to have reviewed. 29 U.S.C. § 660(a).[5]
 
 II
 
 11
 The Occupational Safety and Health Act of 1970 was enacted in order to reduce the substantial burdens placed on interstate commerce because of work-related personnel injuries and illnesses. 29 U.S.C. § 651. Pursuant to the Act, an employer's duty flows from two sources. First, the Act requires that employers "shall comply with . . . standards promulgated under this chapter." 29 U.S.C. § 654(a)(2). Second, where no standards are applicable, Sun Shipbuilding & Drydock Co., 4 OSAHRC 1020, 1043 (1973) (Review Commission), an employer is subject to a general duty to "furnish . . . his employees . . . a place of employment . . . free from recognized hazards . . . likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a) (1). This appeal does not deal with the application of the general duty clause.[6]
 
 
 12
 Pursuant to the Act, the Secretary of Labor is given general authority to promulgate occupational safety and health standards. 29 U.S.C. § 655.[7] The Secretary is authorized to send his agents to a worksite to inspect the area and equipment. 29 U.S.C. § 657(a). If upon such investigation the Secretary or his representative believes that an employer has violated any standard he shall issue a citation setting forth the nature of the violation and a reasonable time for abatement. 29 U.S.C. § 658(a). Thereafter, the Secretary shall notify the employer of any proposed penalty.[8] The employer may contest the citation or the proposed penalty or both.[9]
 
 
 13
 The Commission, through its decisions, has consistently taken the position that exposure to conditions that violate one of the construction standards constitutes a sufficient basis upon which the Secretary may issue a citation and assess a fine against a subcontractor pursuant to 29 U.S.C. §§ 654(a)(2), 666, notwithstanding the fact that the violation is non-serious and was not created by the cited subcontractor. Thus, in Charles S. Powell d/b/a Powell Electric, 3 OSAHRC 1056 (1973) (Review Commission Judge), it was said:
 
 
 14
 (T)hese contentions by Respondent evade the real issue which is the exposure, if any, by Respondent of his employees to hazards. The underlying duty of each and every employer under Section 5 of the Act, regardless of whether an alleged violation was predicated upon paragraph (a)(1) or (a)(2) thereof, is to refrain from exposing employees to hazards. The Act grants no exceptions nor does it permit any delegation of this duty. The Act does not abridge the right to contract, it merely implies that an employer cannot by contract evade this duty to furnish a place of employment that is free of hazards. This duty is imposed upon each employer and makes no distinction as to whether the employer is a general contractor or a subcontractor; it may even include a lessor of employees relinquishing all control. Further the Act does not allow for any severance of responsibility predicated upon who produced or created the hazard or who may initially be responsible for its eradication.
 
 
 15
 Simply stated, whenever a subcontractor exposes his employees to hazards the employer subjects himself to the enforcement provisions of the Act and this is so regardless of who created the hazard or who may be responsible for its elimination.
 
 Id. at 1060-61.[10]
 
 16
 The Commission's position and the one which the Secretary urges on this appeal has not gone uncriticized. In Robert E. Lee Plumbers, Inc., OSHRC Docket No. 2431 (Jan. 30, 1974) (Commission Review Ordered), it was said:
 
 
 17
 Admittedly, the respondent is responsible for the "place of employment," yet no one should conclude that such responsibility imposed by the Act embraces the entire work project as shown in this case. This responsibility is the responsibility of the prime contractor. What then is the responsibility of the respondent, as a subcontractor employer? His responsibility is his worksite or that portion of the work as provided in his contract of employment. Under the Act, the respondent is required to comply with occupational safety and health standards and upon doing so, complys (sic) with the Act by furnishing a place of employment which is free from recognized hazards that are causing or likely to cause death or serious physical harm to his employees. Laws usually follow the rule of reason and thus it would not be reasonable to require a subcontractor to insure a safe workplace for his employees, if to do so would embrace an entire work project on which numerous other contractors' employees are working.
 
 
 18
 Under section 9(a) (29 U.S.C. § 658(a)) of the Act it is mandatory for an abatement period to be fixed with respect to each alleged violation. Respondent then is required to correct any violations, but can he correct a violation, the creation of which was not of his doing nor over which he has any control? Can respondent correct a violation which by doing so would interfere with the work endeavor of another subcontractor? Did Congress intend for an employer to correct a violation, to cease his portion of the work he is required to perform under contract, although the cause of the violation has no relation to his portion of the work under contract? Certainly, these queries must be resoundingly answered in the negative.
 
 
 19
 Id. at 7-8.
 
 
 20
 Similarly, Chairman Moran dissenting from the Commission's reversal of R. H. Bishop Co., 8 OSAHRC 930 (1974) (Review Commission) adopted the following from the Administrative Law Judge:
 
 
 21
 In summary, therefore, while under the Act the employer is required to furnish a safe place to work, the Respondent cannot be held responsible for the default or conduct of the general contractor or other subcontractors on the job. It is in no position to guarantee compliance of all safety regulations by other employing units.
 
 Id. at 938.[11]
 
 22
 The reason for the divergent views is easily explainable. On the one hand the basic purpose of the Act is to prevent employment related injuries. The Secretary and a majority of the Commission have taken the position that this goal can best be achieved by imposing liability on a broad-based scale. Conversely, on the other side is the recognition that the prevailing position treats subcontractors, in light of the purposes of the Act, unnecessarily harshly and inequitably. We have carefully considered the position of both sides and have determined that the Act does not allow the Secretary to issue citations to the petitioning subcontractors for non-serious violations of the regulations involved in this case.
 
 III
 
 23
 In reaching our conclusion we start with an analysis of the legislative scheme enacted by Congress. As previously stated the general duty clause provides that each employer shall furnish to his employees a place of employment free from serious hazards. 29 U.S.C. § 654(a)(1).[12] It speaks in terms of furnishing a place of employment to employees such that they will not be exposed to the proscribed conditions, those conditions being ones that are "likely to cause death or serious physical harm."
 
 
 24
 The other source of an employer's duty under the Act states that an employer "shall comply" with regulations promulgated pursuant to the Act. 29 U.S.C. § 654(a)(2). This subsection, unlike (a)(1) (the general duty clause), does not speak in terms of employee exposure to hazards. If anything at all can be gleaned from the words of the subsection, it is that one who is to be charged with absolute liability be realistically in a position to comply with the promulgated standards. This, as will be shown, is not the case under the Secretary's position.
 
 
 25
 It is true that the general duty clause was included in order to cover the most flagrant of situations and for which the Secretary had not promulgated appropriate regulations, so perhaps not much significance should be accorded the difference in language between the subsections. The varying thrust of the two subsections, however, is significant in at least one respect. The difference in language makes clear that when Congress desires to make mere exposure to a particular hazard a violation of the Act, it knows how to select language to clearly accomplish that goal. This conclusion is reenforced by the Contract Work Hours and Safety Standards Act, 40 U.S.C. § 333, where the language clearly makes exposure to conditions which violated promulgated regulations a violation for both general and subcontractors alike.[13]
 
 
 26
 We start then with the proposition that exposure to non-serious violations of standards promulgated pursuant to (a)(2) do not stand on the same footing as exposure to conditions that are likely to cause serious physical harm or death.
 
 IV
 
 27
 If the literal language of the Act does not clearly require imposing liability on subcontractors for exposure of their employees to non-serious violations, neither does it clearly indicate that subcontractors should have some kind of broad exemption. In considering the proper interpretation of the statute, we have reviewed the legislative history carefully. Regretfully, we have found little that sheds significant light on the problem.[14] We are, therefore, in the unenviable position of rendering an interpretation that seeks to fulfill the stated congressional purpose in an equitable manner, without the aid of a clear legislative record on the subject.
 
 
 28
 The purpose of the Act is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources . . . ." 29 U.S.C. § 651(b).[15] It is clear that the Act is not nor could it be designed to eliminate all occupational accidents. Rather it is designed to require
 
 
 29
 a good faith effort to balance the need of workers to have a sale (sic) and healthy work environment against the requirement of industry to function without undue interference.
 
 
 30
 Legislative History, supra, note 15 at 435 (Remarks of Senator Williams).
 
 
 31
 The Act is designed not to punish, but rather to achieve compliance with the standards and the abatement of safety hazards. The underlying rationale in effectuating these purposes by placing primary responsibility on employers is that employers have primary control of the work environment and should therefore insure that it is safe and healthful. S.Rept.No.91-1282, 91st Cong., 2d Sess. 9 (1970); H.R.Rept.No.91-1291, 91st Cong., 2d Sess. 21 (1970). While this is true in most situations the application of that principle to the construction industry is not wholly accurate. On a multi-employer construction site, it is the general contractor who contractually controls the worksite. The subcontractor's control, for all essential purposes, is contractually limited to his specific field (e. g. electrical, plumbing, painting). Indeed, the subcontractor's contract in this case described their duties in limited terms.[16] Thus, it is clear that the congressional reason for placing on the employer the primary responsibility for complying with occupational hazard and safety standards does not exist in the case of these challenging subcontractors.
 
 V
 
 32
 It seems likely from the foregoing that Congress did not intend to adopt a broad mandatory rule providing that in all cases employee exposure to conditions which are violations of promulgated standards would result in employer liability. Such a rule would equate the employer's duty to comply with the statute with a broader general obligation to assure safe and healthful working conditions for his employees under all circumstances. In short the Secretary's rule, in addition to the employer's clear duty to comply with promulgated standards within his control (29 U.S.C. § 654(a)(2)) and his duty to avoid exposing his employees to hazardous conditions likely to cause death or serious physical harm (29 U.S.C. § 654(a)(1)), would create a still broader general duty of avoiding exposure by his employees to non-serious technical violations created and within the control of third parties.
 
 
 33
 We must consider whether, even though such a nonstatutory general duty clause has not been mandated by Congress, it may nevertheless represent a rule which the Secretary has discretion to adopt. We conclude that the Secretary's rule involves a policy choice of such magnitude and would lead to results under the Act, not intended by the Congress, that it may not be appropriately adopted without more direct statutory authorization. An examination of the effects of the Secretary's rule on the construction industry and the policy considerations mitigating against such a rule confirms our conclusion.
 
 
 34
 We fail to see how requiring several different employers to place a proper guard rail over an opening or along the edge of open-sided floors or intermediate rails on stairways fulfills the purposes of the Act any more effectively than requiring only one employer to do so. The Secretary's position is premised on the theory that the more people responsible for correcting any violation, the more likely it will get done. This is, of course, not necessarily true. Placing responsibility in more than one place is at least as likely to cause confusion and disruption in normal working relationships on a construction site. Such a policy might in effect prove to be counterproductive.
 
 
 35
 In any event even if the Secretary's position on this point was correct, the benefits to be gained from his policy must be considered in light of the other likely effects of that policy on the construction industry. To the extent that the Secretary has not allowed employers to avoid liability under the Act by contractual arrangements between the various employers,[17] some employers have sought to place liability on the party at fault by contractual indemnification clauses that would operate whenever liability was imposed on a party not responsible for a cited violation.[18] As these clauses continue to proliferate it will mean that the Secretary's policy will tend unnecessarily to favor general contractors. When jobs are to be subcontracted out, it is usually the general contractor who will be bargaining from a position of strength and thus able to shift liability away from himself.
 
 
 36
 Even if contractual liability was fairly allotted to the party at fault, the Secretary's policy of citing all employers at the site might necessitate litigation between the parties to finally affix liability. To require the parties in an ongoing relationship to resort to the courts to accomplish the objectives of fixing final responsibility for the abatement of minor hazards would seem to be an undesirable policy and one which Congress could not have intended.
 
 
 37
 In addition to the confusion that might be caused by the Secretary's interpretation, the thrust of multi-employer liability is economically wasteful and in some cases totally impractical. The Secretary's policy requires multiple expenditures in the discovery of violations. Since each employer is responsible for every violation to which his employees are exposed, they are in effect required to discover violations that are beyond their area of expertise. This requires electricians and plumbers for example to be familiar with the standards for general carpentry work and in reverse, that carpenters be familiar with standards bearing on the work of more technical specialists. Not only are the most obvious violations required to be discovered, but also the most subtle; ones not likely to cause serious physical harm or death. This is a burdensome requirement especially in relation to non-serious hazards.
 
 
 38
 In addition, the Secretary's rule might cause duplicate expenditures to be made in the actual abatement of hazards by different employers. Furthermore, union contracts ordinarily require that only employees of certain crafts be permitted to undertake certain work.[19] Thus, an electrical or other speciality subcontractor would often be required to hire additional employees in order to abate a hazard. For most subcontractors this would be uneconomical, and for small ones perhaps completely destroy the benefit of their contract. This result seems all the more curious in this situation where other subcontractors or the general contractor, who had more direct responsibility for general construction, already had the available equipment and personnel to undertake the correction of the stairway, elevator shaft and building edges. At any rate in relation to non-serious violations we do not believe that Congress intended to subvert the well established craft jurisdiction concept or to impose burdensome expenses on subcontractors which do not have the appropriate employees to abate certain hazards.[20]
 
 
 39
 Assuming as we have just found that requiring abatement of hazards by subcontractors not responsible for the violating conditions is impractical, the only other alternative available is for such a subcontractor to remove his employees from the job after a violation is discovered and prior to a citation being issued. This again not only requires a subcontractor to be able to recognize non-serious violations outside its field of expertise, but also is an unrealistic and economically unfeasible solution.
 
 
 40
 On many construction jobs the withdrawal of a single subcontractor, upon whose work future construction depends, could conceivably cause an entire project to shut down. The subcontractor who wants to avoid OSHA liability must guess at his peril that in fact a violation exists. Presumably, if it guesses wrong the owner or general contractor would have an action for all too often very substantial damages caused by delay in the completion of a project. Whether a violation actually exists is not always easy to determine either before or even after a citation issues, since a successful contest may be brought. It is even more difficult for a subcontractor to make the correct choice in cases where a violation is non-serious, for example as in this case where the citation was for technically improper guarding devices, and not for a clearly visible total absence of guards.
 
 
 41
 To the extent that the Secretary's policy will lead to the removal of workers from construction sites because of non-serious violations we find that policy inconsistent with the Act. Correcting the hazard, not shutting down construction sites, is the desired result. It is the former not the latter that is consistent with the balance approach. The standards are to be set "in terms of objective criteria and of the performance desired." H.Rept.No.91-1765, 91st Cong., 2d Sess. 35 (1970) (Conference Report accompanying S. 2193). The Secretary, proceeding in district court, can seek to temporarily restrain any activity on a work site in imminent danger situations. 29 U.S.C. § 662. There was significant congressional debate over this section and the extent of its scope. See, e. g. H.Rept.No.91-1765, supra at 40. Clearly, a non-serious violation of the promulgated standards is not the type of imminent danger Congress contemplated when they included this section. To the extent that the Secretary may achieve a shut down of a work site by citing a subcontractor for allowing his employees to be exposed to non-serious violations, that policy is inconsistent with the imminent danger provisions of the Act.
 
 
 42
 For all of the foregoing reasons we have determined that the Secretary's and Commission's position cannot be sustained.
 
 VI
 
 43
 In reaching this decision we have recognized that both sides have substantial merit in their position. We have not sought to undercut the Secretary's authority or in any way frustrate the purposes of the Act. We have balanced the Secretary's interest in enforcing his policy, and the purposes that policy serves, against the inefficient, uneconomical and inequitable effects it has on certain employers.
 
 
 44
 It is important to define precisely what effect our decision is intended to have. We have not told the Secretary whom he must hold liable where there is joint responsibility for the existence of a standard violation.[21] Similarly, we have not held that the Secretary's policy of imposing liability on employers for exposure to conditions that are serious violations of promulgated standards is invalid. Nor have we held that exposure by a subcontractor's employees to a non-serious standard violation, which he created or is otherwise responsible for is impermissible. We have only held that these petitioners are not responsible for the conditions deemed non-serious violations of the promulgated standards by the Secretary and, therefore, that the Secretary's policy of imposing liability on them merely because their employees were exposed to conditions which they neither created, caused, nor are otherwise responsible for, does not, on balance, fulfill the purposes of the Act. Since the facts of this case fall into this narrow holding, we set aside the order of the Commission in both 74-1381 and 74-1382.
 
 
 45
 TONE, Circuit Judge (concurring).
 
 
 46
 I too would set aside the order of the Commission, but on a narrower ground than that relied on by the majority.
 
 
 47
 The respondents treat the case as if petitioners had been cited for failure to comply with a standard requiring them to take their employees off the job if the worksite did not meet the requirements of 29 C.F.R. § 1926.500 (1974) as to midrails for guardrails, etc. The only standards that could conceivably be interpreted as having that effect are 29 C.F.R. § 1910.12 (1974), which requires "each employer" to "protect the employment and places of employment of each of his employees engaged in construction work by complying with" the standards in Part 1926, Subpart C et seq., of the chapter, and 29 C.F.R. § 1926.20(b)(1) (1974), which requires employers to "initiate and maintain such programs as may be necessary to comply with this part." But respondents do not argue that either § 1910.12 or § 1926.20(b)(1) is to be so interpreted, and in any event petitioners were not cited for violating either of those sections. They were cited for "(f)ailure to properly guard open sided floors . . ., floor openings . . ., (and) stairways . . ." in the manner prescribed by §§ 1926.500(b)(1), (d)(1), and (e)(1), in violation of those sections.[1] Plainly petitioners are charged in the citations, not with failure to take their employees off a job when other subcontractors had failed to comply with 1926.500 standards, but with failure to erect proper guardrails, etc. This is confirmed by the inclusion in the citation of "(d)ate(s) by which the alleged violation(s) must be corrected," ranging from 25 days to 46 days after the inspection at which the violation was discovered, which implies that petitioners were to make corrections other than merely taking their employees off the job. The erection of proper guardrails, etc., was work beyond the competence and jurisdiction of the trades of which petitioners' employees were members, as Judge Sprecher points out.
 
 
 48
 Thus, the Secretary could not justify these citations merely by showing that the statute, 29 U.S.C. § 654(b), authorizes him to impose sanctions on an employer for failure to take his employees off a job where standards as to working conditions are not complied with. He would have to demonstrate that the statute authorizes him to impose sanctions on an employer for failure to cause his employees to perform carpentry work on guardrails, etc., which the employees, who are not members of the carpentry trade, have neither the competence nor the jurisdiction to do. I think section 654(b) cannot reasonably be so interpreted. Congress, whose underlying rationale in adopting the statute, as Judge Sprecher points out, was that the employer has control of the work environment and should therefore be responsible for making it safe, could not have intended that the employer be sanctioned for failure to correct conditions he could not correct.
 
 
 49
 Whether the Secretary could impose sanctions on an employer for allowing his employees to work in the presence of non-serious violations created by others is an issue I would not reach on this appeal.[2]
 
 
 
 [1]
 No employees from Anning-Johnson were working on the fifth floor at the time of the inspection
 
 
 [2]
 Wright did not contest the citations issued to it
 
 
 [3]
 29 C.F.R. § 1926.500 provides in relevant part:
 Guardrails, handrails, and covers.
 (a) General provision. This subpart shall apply to temporary or emergency conditions where there is danger of employees or materials falling through floor, roof, or wall openings, or from stairways or runways.
 (b) Guarding of floor openings and floor holes. (1) Floor openings shall be guarded by a standard railing and toe boards or cover, as specified in paragraph (f) of this section. In general, the railing shall be provided on all exposed sides, except at entrances to stairways.
 (d) Guarding of open-sided floors, platforms, and runways. (1) Every open-sided floor or platform 6 feet or more above adjacent floor or ground level shall be guarded by a standard railing, or the equivalent, as specified in paragraph (f)(i) of this section, on all open sides, except where there is entrance to a ramp, stairway, or fixed ladder. The railing shall be provided with a standard toeboard wherever, beneath the open sides, persons can pass, or there is moving machinery, or there is equipment with which falling materials could create a hazard.
 (e) Stairway railings and guards. (1) Every flight of stairs having four or more risers shall be equipped with standard stair railings or standard handrails as specified below, the width of the stair to be measured clear of all obstructions except handrails:
 (i) On stairways less than 44 inches wide having both sides enclosed, at least one handrail, preferably on the right side descending;
 (ii) On stairways less than 44 inches wide having one side open, at least one stair railing on the open side;
 (iii) On stairways less than 44 inches wide having both sides open, one stair railing on each side;
 (iv) On stairways more than 44 inches wide but less than 88 inches wide, one handrail on each enclosed side and one stair railing on each open side;
 (v) On stairways 88 or more inches wide, one handrail on each enclosed side, one stair railing on each open side, and one intermediate stair railing located approximately midway of the width.
 
 
 [4]
 Initially, the penalties were set at $300, but pursuant to OSHA policy this figure was reduced
 
 
 [5]
 The subcontractors petitioned for review of the Administrative Law Judge's decision, but no commissioner directed review and therefore the decision of the Administrative Law Judge became a final order of the Commission. 29 U.S.C. § 661(i)
 
 
 [6]
 The general duty clause is not involved in this case, because by its terms the duty embodied in that clause flows only to hazards that are causing or likely to cause death or serious physical harm. In 29 U.S.C. § 666(j) a serious violation is deemed to exist "if there is a substantial probability that death or serious physical harm could result . . . ." This definition parallels closely the wording of the general duty clause. In the present case the Secretary has classified the violations as "non-serious" which means ones that are not likely to cause death or serious physical harm and therefore outside the scope of the general duty clause. See generally Morey, The General Duty Clause of the Occupational Safety and Health Act of 1970, 86 Harv.L.Rev. 988 (1973)
 
 
 [7]
 The standards in the present case were originally made effective pursuant to 21 U.S.C. § 653(b)(2) which provides in relevant part:
 The safety and health standards promulgated under . . . Public Law 91-54, Act of August 9, 1969 . . . are superseded on the effective date of corresponding standards, promulgated under this chapter, which are determined by the Secretary to be more effective. Standards issued under the laws listed in this paragraph . . . shall be deemed to be occupational safety and health standards issued under this chapter . . . .
 The 28 C.F.R. part 1926 standards were promulgated under the Contract Work Hours and Safety Standards Act, Pub.L. 91-54, codified at 40 U.S.C. § 333. They were adopted as occupational safety and health standards pursuant to 29 C.F.R. § 1910.12. For more on the interrelationship between the Contract Work Hours and Safety Standards Act and the Occupational Safety and Health Act see note 13, infra.
 
 
 [8]
 Any employer who has received a citation for a violation of 29 U.S.C. § 654 may be fined up to $1,000 for each violation. If cited for a serious violation some fine up to $1,000 must be levied. If an employer willfully or repeatedly violates section 654 he may be fined up to $10,000. Similarly, a failure to correct a violation within the time period allowed may be fined up to $1,000 for each day during which such violation remains unabated. 29 U.S.C. § 666
 
 
 [9]
 If no notice of contest is filed within fifteen days from receipt of the Secretary's citation, the citation and the assessment, as proposed, shall be deemed to be a final order of the Commission and not subject to review by any court or agency. 29 U.S.C. § 659(a)
 
 
 [10]
 For other cases with similar holdings see Savannah Iron & Fence Corporation, 10 OSAHRC 1 (1974) (Review Commission); Armor Elevator Company, Inc., 5 OSAHRC 260 (1973) (Review Commission); Sunray Electric Corporation, 7 OSAHRC 615 (1974) (Review Commission Judge); Star Circle Wall Systems, Inc., 3 OSAHRC 719 (1973) (Review Commission Judge); Skil-Craft Builders, Inc., 3 OSAHRC 622 (1973) (Review Commission Judge); Howard P. Foley Company, 3 OSAHRC 414 (1973) (Review Commission Judge); Jaffie Contracting Company, Inc., 2 OSAHRC 466 (1973) (Review Commission Judge); Fireproof Products Company, Inc., 2 OSAHRC 475 (1973) (Review Commission Judge); Ellison Electric, 1 OSAHRC 547 (1972) (Review Commission Judge); FEC, Inc., 1 OSAHRC 389 (1972) (Review Commission Judge)
 
 
 [11]
 See also Anning-Johnson Co., OSHRC No. 3694 (May 3, 1974) (Commission Review Ordered); Anning-Johnson Co., OSHRC No. 4409 (April 19, 1974) (Commission Review Ordered)
 
 
 [12]
 See note 6, supra and accompanying text
 
 
 [13]
 There is another reason why we believe the Secretary should not force this inequitable burden on subcontractors. The standards which the challenging subcontractors in this case are accused of violating were initially adopted pursuant to the Contract Work Hours and Safety Act, 40 U.S.C. § 333. See note 7, supra. That act provided in specified construction contracts with the federal government that:
 (N)o contractor or subcontractor . . . shall require any laborer . . . employed in the performance of the contract to work in surroundings or under working conditions which are unsanitary, hazardous, or dangerous to his health or safety, as determined under construction safety and health standards . . . .
 The standards applicable in this case, see note 3, supra, do not specifically declare that exposure to non-conforming conditions will be a violation, and unlike the Contract Work Hours and Safety Act the language of OSHA's subsection (a)(2) does not speak in strict exposure terms.
 The standards adopted pursuant to the Contract Work Hours and Safety Act included the following:
 (b) By contracting for full performance of a contract . . . the prime contractor assumes all obligations prescribed as employer obligations under the standards contained in this part, whether or not he subcontracts any part of the work.
 (c) To the extent that a subcontractor of any tier agrees to perform any part of the contract, he also assumes responsibility for complying with the standards in this part with respect to that part. Thus, the prime contractor assumes the entire responsibility under the contract and the subcontractor assumes responsibility with respect to his portion of the work. With respect to subcontracted work, the prime contractor and any subcontractor or subcontractors shall be deemed to have joint responsibility.
 (d) Where joint responsibility exists, both the prime contractor and his subcontractor or subcontractors, regardless of tier, shall be considered subject to the enforcement provisions of the Act.
 
 
 [29]
 C.F.R. § 1926.16 (emphasis added)
 This regulation was part of subpart B of 29 C.F.R. part 1926. Subpart B was not adopted by the Secretary in promulgating OSHA standards, 29 C.F.R. § 1910.12(c), but the reason for not adopting was unrelated to that part of the regulation which makes subcontractors responsible only for their own work. The foregoing language may well have precluded liability against subcontractors who allowed their employees to be exposed to conditions not caused by them but which violated promulgated standards. In any case, we were not advised that the difference in statutory language in relation to subcontractors was considered by the Secretary prior to the decision to hold them liable.
 While we do not rest our decision on the manner in which the Secretary's policy was arrived at, we do note that there is a substantial likelihood that the present policy evolved into a hard and fast rule without much consideration and certainly without comment from those likely to be affected, as is the general procedure under the Act. 29 U.S.C. § 655(b).
 
 
 [14]
 As Commission Chairman Moran has stated:
 In enacting this law, Congress apparently gave little thought to the unique relationship which arises when employees of a number of different employers work in and around the same job site and are subject to the hazards which may exist at that site hazards which may or may not have been created by their own employer or someone else's or by some other employees of a totally unrelated and unknown employer.
 Address by OSHRC Chairman Moran, National Construction Industry Conference of the American Arbitration Association, Boston, Massachusetts, April 24, 1974.
 
 
 [15]
 It was observed during debate in the Congress that the more than 14,500 workers killed by work-related accidents each year represented an annual death toll exceeding that of the Vietnam war. Subcomm. on Labor of Senate Comm. on Labor and Public Welfare, Legislative History of the Occupational Safety and Health Act of 1970, 92d Cong., 1st Sess. 411 (Comm.Print 1971) (remarks of Senator Williams)
 
 
 [16]
 The contract in this case between Wright and Workinger Electric provided that the latter in accordance with the plans and specifications of the architect do the "Electrical Work Complete." Similarly, Anning-Johnson was "To furnish and install the Sprayed on Fireproofing" in accordance with the architect's plans
 In both contracts the only reference to OSHA was the following:
 Sub-contractor agrees to comply with all requirements of the Occupational Safety and Health Act (Current Edition) and to save harmless and indemnify General Contractor from and against any and all liabilities imposed on the contractor for violations of said act arising out of the work covered by this sub-contractor.
 No reference is made to correcting safety hazards beyond the scope of the subcontractor's primary duties.
 
 
 [17]
 See, e. g., Armor Elevator Company, Inc., 5 OSAHRC 260, 278-79 (1973) (Review Commission); Skil-Craft Builders, Inc., 3 OSAHRC 622, 627-28 (1973) (Review Commission Judge); Howard P. Foley Company, 3 OSAHRC 414, 419 (1973) (Review Commission Judge)
 
 
 [18]
 One commentator has suggested that this represents an adequate solution to the problem created by multi-employer construction sites. It not only encourages the general contractor and the subcontractor to consider in advance the allocation of safety responsibilities, but also would not involve the government in determining which of a number of parties was at fault. Comment, OSHA: Developing Outlines of Liability in Multi-Employer Situations, 62 Geo.L.J. 1483, 1496-98 (1974) (hereinafter OSHA Comment)
 
 
 [19]
 Both subcontractors in this case have stipulated to the fact that they were not contractually precluded from performing the carpentry work required to abate the various violations. This is true despite the fact that at least Anning-Johnson was a member of the General Building Contractors Council of Elkhart, Indiana which had an agreement with Elkhart Carpenters Local No. 565 that only employees in the Carpenters bargaining unit shall perform all work covered by the Agreement. Art. II, § 4. The work covered by the agreement covered all general carpentry work and would seem to include the type of work that would have been required on the present project to avoid a citation. Art. X, § 2. Neither of the challenging subcontractors had any employees belonging to Carpenters Local 565 working on the project
 In any event to the extent that the subcontractors in this case were not contractually precluded from abating the hazards per their stipulations, this is an exception to the general situation and it is not significant in determining what Congress intended when they passed this Act.
 
 
 [20]
 We are fully aware that both the "beyond the expertise" and the "craft jurisdiction" arguments have been rejected as defenses by the Commission. Charles S. Powell d/b/a Powell Electric, 3 OSAHRC 1056 (1973) (Review Commission Judge)
 
 
 [21]
 Although it is not necessary for a decision in the present case, because the general contractor was cited for violations of the same standards as petitioners, we are not at all sure that a general contractor, who has no employees of his own exposed to a cited violation is necessarily excused from liability under the Act. But see Brennan v. Gilles & Cotting, Inc., 504 F.2d 1255 (4th Cir. 1974); see also OSHA Comment, supra note 18 at 1490, 1496
 
 
 [1]
 Workinger was also charged with "(f)ailure to use an approved safety can for the storage and dispensing of flammable liquids," but that violation was not contested
 
 
 [2]
 It is likewise unnecessary in my view of the case, as with the majority's, to consider the contention of amicus curiae that the Secretary cannot do so, in any event, by ad hoc adjudication but only by a rule-making procedure. But cf. N.L.R.B. v. Bell Aerospace Co., 416 U.S. 267, 290-295, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974)