**SI COMMUNICATIONS, INC., Plaintiff,**

**v.**

**NIELSEN MEDIA RESEARCH, Defendant.**

**No. 96 Civ. 2608(DAB).**

United States District Court, S.D. New York.

Jan. 28, 2002.

John DeMaio, New York City, for Plaintiff.

John J. Kuster, Sidley & Austin, New York City, for Defendant.

## MEMORANDUM OPINION

BATTS, District Judge.

Plaintiff SI Communications Inc.'s (hereinafter "SI") brings this action alleging breach of an implied covenant of good faith and fair dealing in its contract with Defendant Nielsen Media Research (hereinafter "Nielsen"). Defendant Nielsen now moves for summary judgment dismissing Plaintiff SI Communications Inc.'s (hereinafter "SI") claims and granting Nielsen's counterclaims pursuant to Federal Rule of Civil Procedure 56.

For the reasons stated below, Defendant's Motion for Summary Judgment is hereby granted.

## I. BACKGROUND [1]

SI is a California corporation in the business of producing syndicated television programming to be distributed to various television stations and cable networks across the country. Specifically, SI is in the "barter syndication" business, in which television program broadcast rights are provided to stations and/or cable networks at little or no charge, in exchange for some advertising time which the barter syndicator keeps for itself to sell to national advertisers directly or through advertising agencies. (Def.'s 56.1 Stmt. ¶ 4; Hudak Aff. ¶ 2.) Defendant Nielsen, a Delaware corporation with its principal place of business in Illinois, is a media research firm that provides "ratings" estimates for a variety of clients, including television stations, broadcast and cable networks, barter syndicators, advertisers, advertising agencies, and producers. (Def.'s 56.1 Stmt. ¶ 6; Dockery Dep. Ex. N–4 at 99.)

In 1992, SI entered into a five-year Nielsen Syndication Service Agreement ("Agreement") with Nielsen, under which Nielsen provided SI with television ratings estimates of African–American viewers. (Def.'s 56.1 Stmt. ¶¶ 1, 33, 36; Dockery Dep. at 107–08.) Pursuant to the Agreement, Nielsen provided SI with television ratings estimates during SI's programs, which SI and its sales representatives used in order to sell national advertising time through barter syndication. (Def.'s 56.1 Stmt. ¶¶ 5, 24, 25; Compl. ¶ 3; Dockery Dep. at 34–39.) Nielsen has supplied the data, but SI has not paid for them since at least 1996. (*Id.;* Dockery Dep. at 143–44.)

In order to prepare its national ratings estimates, Nielsen uses a "national people-meter sample" to derive audience estimates for national broadcast networks, national cable television networks, and programs distributed nationally by barter syndicators. (Def.'s 56.1 Stmt. ¶ 8; Dockery Dep. Ex. N–4 at 1–12.) Nielsen collects viewing information directly from a "people-meter," an electronic keypad on each television in members' households that they use in order to enter their viewing status. (Def.'s 56.1 Stmt. ¶ 9; Dockery Dep. Ex N–4 at 7.) National Audience Demographic ("NAD") ratings estimates, which Nielsen then provides to its customers, are based on data extrapolated from the national people-meter sample, and provide viewing information such as age/sex, arranged by various market breaks such as race, household size, and income. (Def.'s 56.1 Stmt. ¶ 11; Dockery Dep. Ex N–4 at 7–14.)

SI aims its programs at predominantly African–American audiences. (Def.'s 56.1 Stmt. ¶ 3; Compl. ¶ 2.) A rating for a narrow demographic segment is based on data from a small subset of the persons whose households are included in the national people-meter sample. (Def.'s 56.1

1. Plaintiff has not submitted a Local Rule 56.1 statement. Pursuant to Local Civil Rule 56.1(c), Defendant's version of the material facts are deemed admitted.

Stmt. ¶ 38; Dockery Dep. at 38–39.) The fact that African–American household demographic ratings were available in the NAD reports was publicly known since 1991, one year prior to the date of the Agreement between Nielsen and SI. (Def.'s 56.1 Stmt. ¶ 13.) Furthermore, the actual size of the national people-meter sample is stated in Nielsen's National Reference Supplement, which is incorporated into every Nielsen Syndication Service Agreement, including the Agreement between Nielsen and SI. (Def.'s 56.1 Stmt. ¶ 15; Dockery Dep. at 111; Hudak Aff. Ex. N–4 at 1; Hudak Aff. ¶ 8.)

In particular, Nielsen's Reference Supplement states that "[s]ince the audience estimates in national reports are based on a sample, they are subject to sampling error," which is defined as the difference between the results obtained by measuring a sample versus measuring the entire population.[2] (Def.'s 56.1 Stmt. ¶ 18; Dockery Dep. Ex. N–4 at 32; Def.'s Mem. in support of its 56.1 Stmt. at 4; Hoynoski Aff. ¶ 4.) Inaccuracies in reporting by individuals or households are called "non-sampling errors," to which ratings estimates are also subject. (Def.'s 56.1 Stmt. ¶ 20; Dockery Dep. Ex. N–4 at 35.) The National Reference Supplement fully discloses the types of errors to which Nielsen's ratings estimates are subject. (Def.'s 56.1 Stmt. ¶ 21; Dockery Dep. Ex. N–4 at 32; Dockery Dep. at 123.)

In the Agreement's "Limitation of Liability" provision, it specifically provides that

NIELSEN MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO ANY SERVICES, ANALYSES OR DATA OR ANY SOFTWARE PROVIDED HEREUNDER AND ALL OF SUCH WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED BY NIELSEN AND WAIVED BY CLIENT.

(Def.'s 56.1 Stmt. ¶ 28; Dockery Dep. Ex. N–3 ¶ 5(d)). Moreover, the Agreement states:

Nielsen shall not be liable in breach of contract or otherwise, and [SI] expressly waives any claims against Nielsen, for any loss, injury or damage of any kind directly or indirectly resulting from any errors or inaccuracies in any NSS ... report or data or other information furnished hereunder or failure to furnish the same ... or from any actions, whether or not negligent of Nielsen or any officer, agent or employee of Nielsen, in compiling or publishing any NSS ... report or data or other information.

(Def.'s 56.1 Stmt. ¶ 29; Dockery Dep. Ex. N–3 ¶ 5(d)).

Further, over a two-year period starting in 1994, Nielsen increased the size of the national people-meter sample from approximately 4,000 to 5,000 households.[3] (Def.'s

---

**2.** "Sampling" involves measuring a subset of a group and extrapolating the results to make estimates for the entire group, and is necessarily less accurate than a method whereby each and every group member is measured, such as a census. (Hoynoski Aff. ¶ 4.)

**3.** Defendant further alleges that between June 1994 and June 1996, Nielsen was part of former U.S. Representative Cardiss Collins' (D–Ill.) task force, which examined and dis-

cussed various issues concerning Nielsen's ratings estimates for African–American viewers. (Def.'s 56.1 Stmt. ¶ 41; Hudak Aff. ¶ 13; Dockery Dep. Ex. N–9.) The task force's report emphasized the "accomplishments, outstanding team work and good-faith efforts" of the task force participants, including Nielsen. (Def.'s 56.1 Stmt. ¶ 45; Dockery Dep. Ex. N–9 at 2.) During this period, Nielsen made efforts to educate its clients on the use of its ratings

56.1 Stmt. ¶ 16; Dockery Dep. at 52–57; Hudak Aff. ¶ 6.) This increase had the effect of reducing the sampling error for ratings estimates that were derived from that sample. (Def.'s 56.1 Stmt. ¶ 17; Dockery Dep. Ex. N–4 at 32.)

In the instant matter, SI asserts that its advertisers expected the error factors to reflect the industry customer standard of plus or minus 4 percent. (Dockery Dep. at 39.). However, because African–American viewers comprised only 10 percent of all of the households that Nielsen surveyed, reflecting more or less their percentage in the general population, the sampling error was sometimes 50 percent or higher. (Dockery Dep. at 37.) Therefore, SI claims that Nielsen should compensate it for its consequential loss of advertising revenue, loss of other revenues, and unnecessary expended sums due to the percentage "error factor" that were caused by Nielsen's inaccurate demographic ratings.[4] (Def.'s 56.1 Stmt. ¶¶ 34, 35; Compl. ¶ 8; Dockery Dep. at 34.)

SI also claims that Nielsen was contractually obligated to provide ratings estimates for certain categories of African–American persons with relative error levels consistent with other categories associated with estimates based on data drawn from the national people-meter sample as a whole. (Def.'s 56.1 Stmt. ¶ 36; Dockery Dep. at 39, 57–58, 138–39, 227, 236.) SI argues that Nielsen thus should increase the size of the national people-meter sample to whatever extent necessary in order to reduce the relative error for African–American demographic ratings estimates to the levels typically associated with the ratings estimates for the total national people-meter sample. (Def.'s 56.1 Stmt. ¶ 39; Dockery Dep. at 57–58.) None of these alleged obligations are set forth in the contract.

Additionally, SI claims that Nielsen acted in bad faith. (Pl.'s Aff. in Opp.; Pl.'s Mem. Law; Compl. ¶ 6.) Specifically, SI states that Nielsen was consistently unreasonable in providing profoundly inaccurate and unreliable samples of African–American households. (Compl. ¶ 6.)

Finally, SI argues that Nielsen is the only acceptable rating service in the industry and is, therefore, a de-facto monopoly. (Compl. ¶ 4; Dockery Dep. at 58.) SI claims that "the commercial disparity between the only ratings service accepted by advertisers and a small black producer who must use these ratings to survive is both obvious and undeniable." (Pl.'s Aff. in Opp.) Thus, SI asserts, the Limitation of Liability provision of the Agreement is unconscionable and consequently unenforceable. (Pl.'s Aff. in Opp.; Pl.'s Mem. Law.)

Nielsen responds that Illinois law, which governs this claim, does not recognize a distinct cause of action for breach of an "implied covenant of good faith" in a contract, that SI's claim is based solely upon its dissatisfaction with the level of "sampling error" in the African–American demographic ratings estimates it has received from Nielsen, and that SI's claim is barred by the express limitation of liability contained in the contract. Furthermore, Nielsen asserts that to increase the size of

estimates for African–American households and buyers and sellers of advertising time. (Def.'s 56.1 Stmt. ¶ 43; Dockery Dep. Ex. N–9 at 2–3.) Nielsen has also taken steps to improve the cooperation rate among minority households that were to be included in Nielsen's national people meter sample. (Def.'s 56.1 Stmt. ¶ 44; Hudak Aff. ¶ 12; Dockery Dep. Ex. N–9 at 3–4.)

4. In particular, SI claims that Nielsen owes it 10 million dollars in lost profits and other consequential damages. (Dockery Dep. at 94–95; Def.'s Reply Mem. at 7.)

the national people-meter sample in order to reduce the relative error for African–American demographic ratings estimates to the levels outlined by Plaintiff would impose a significant financial burden and is thereby untenable and unnecessary. (Def.'s 56.1 Stmt. ¶ 40; Hoynoski Aff. ¶ 9; Hudak Aff. ¶ 9.)

## II. DISCUSSION

The principles applicable to summary judgment are familiar and well-settled. Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

As a general rule, all ambiguities and all inferences drawn from the underlying facts must be resolved in favor of the party contesting the motion, and all uncertainty as to the existence of a genuine issue for trial must be resolved against the moving party. *LaFond v. General Physics Servs. Corp.*, 50 F.3d 165, 171 (2d Cir.1995). As is often stated, "[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. LILCO*, 933 F.2d 187, 191 (2d Cir.1991). Specifically, summary judgment is appropriate for a breach of contract claim only where the language of the contract is unambiguous. *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir.1996).

## A. Illinois Breach of Contract Standards

Both parties agree that Illinois law governs the interpretation of the Agreement based on an explicit contractual choice of law clause. *See* Def.'s 56.1 Stmt. ¶ 30. Therefore, in interpreting the Agreement, this Court must follow applicable Illinois principles of contract construction. *See LaSalle Nat'l Bank v. Service Merchandise Co.*, 827 F.2d 74, 78 (7th Cir.1987).

Under Illinois law, a plaintiff must establish the following elements to prevail on a breach of contract claim: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) injury to the plaintiff resulting from the breach. *See South Central Bank and Trust Co. v. Citicorp Credit Services, Inc.*, 863 F.Supp. 635, 640 (N.D.Ill.1994). Where there is no provision to the contrary in the contract, the customs and usages of the trade are presumed to form a part of the contract. *See Fifteenth Ave. Christian Church v. Moline Heating and Construction Co.*, 131 Ill.App.2d 766, 265 N.E.2d 405, 408 (1970) (holding courts should interpret the contract using the references of the particular customs and usages of the trade of the parties to the contract).

## B. Good Faith and Fair Dealing

In Illinois, every contract contains an implied covenant of good faith and fair dealing. *See First Nat'l Bank of Cicero v. Sylvester*, 196 Ill.App.3d 902, 144 Ill.Dec. 24, 554 N.E.2d 1063, 1069 (1990). However, Illinois law does not recognize *independent* claims based on breaches of any implied duties of good faith. *See Household Financial Services, Inc. v. Coastal Mortgage Services, Inc.*, 152

F.Supp.2d 1015, 1024 (N.D.Ill.2001) (quoting *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1105–06 (7th Cir.1997) (finding that plaintiff could not bring a separate cause of action for a breach of implied duty of good faith and fair dealing)). Thus, while a duty of good faith and fair dealing guides the relations of the contracting parties, an implied covenant argument is within a breach of contract claim, " 'not standing alone as its own claim.' " *Id.* (quoting *Echo, Inc.*, 121 F.3d at 1106).

■ Thus, although courts often refer to the obligation of good faith that exists in every contractual relationship, this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document. *See Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir.1990). " 'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Id.* When the contract is silent, principles of good faith fill the gap, but do not block use of terms that actually appear in the contract. *See id.*

■ In the instant matter, the Agreement is not silent; Plaintiff's complaint regarding sampling error was explicitly contemplated by the contracting parties. In its National Reference Supplement, Nielsen expressly informs its customers about inevitable sampling error, the size of the national people-meter sample, and the relationship between sample size and sampling error. *See* Hudak Aff. Ex 2 at 32–35. Moreover, prior to entering into the Agreement, SI knew the sample size that would be used and how demographic information is collected by means of a people-meter. *See* Dockery Dep. at 114–16. Thus, because Nielsen's obligations were explicitly stated in the contract, this court will not import notions of good faith to fill the gap where there is no gap to be filled.

■ Nevertheless, the implied covenant of good faith and fair dealing contained within the contract should "guide[ ] the construction of the explicit terms of the contract." *Baxter Healthcare Corp. v. O.R. Concepts, Inc.*, 69 F.3d 785, 792 (7th Cir.1995) (quoting *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir.1992)). Issues involving whether a party exercises good faith and fair dealing usually arise when one party to a contract is given broad discretion in performance. *See Hall v. Nat'l Collegiate Athletic Ass'n*, 985 F.Supp. 782, 794 (N.D.Ill.1997). Moreover, the covenant of good faith requires that a party vested with contractual discretion exercise that discretion reasonably, not arbitrarily or capriciously, or in a manner inconsistent with the reasonable expectations of both parties. *See First Nat'l Bank of Cicero*, 144 Ill.Dec. 24, 554 N.E.2d at 1069.

SI claims that Nielsen gave itself broad discretion in what ratings to supply and that the doctrine of good faith requires reasonableness in the execution of that discretion. *See* Pl.'s Mem. Law. SI, however, has not provided the Court with any evidence that Nielsen did not use reasonable efforts to provide SI with accurate ratings pursuant to the standards set forth in the Agreement.[5] In fact, SI cannot

---

5. The Agreement states,

Nielsen's obligations hereunder shall be limited to use of all reasonable efforts to furnish the information required to be delivered hereunder and, in the interest of accuracy, Nielsen shall not be obligated to furnish NSS and/or NTI reports or data when conditions (e.g. audience size or unavailability of station lineup information) are not such as to permit Nielsen techniques to

point to any genuine issue of material fact concerning Nielsen's performance of the Agreement according to its terms, including an explicit limitation of liability clause, to be discussed *infra*.

SI contends only that part of Nielsen's reasonable efforts should have included measuring more African–American households among the national people-meter sample, in order for the sampling error to be similar to the error factor of the total audience. *See* Dockery Dep. at 39–41. Although not obligated to do so, Nielsen increased the number of households in the national people meter sample from 4,000 to 5,000. Still, SI claims that this increase in households measured was not enough and that the error factor for the African–American component of the sample should be about 4 percent, which is the same error factor as for the total audience. *See* Dockery Dep. at 39.

However, SI recognizes that a rating for a narrow demographic segment of the national people-meter sample is based on data from a small subset of the persons in the national sample. *See* Dockery Dep. at 38–39. Consequently, basic statistical principles mandate that the sampling error derived from the ratings for this narrow demographic category will be higher than the sampling error associated with ratings estimates for the sample as a whole because sampling error increases as sample size decreases. Further, SI has failed to identify anything that Nielsen should have done differently, aside from increasing the national people-meter sample to levels that would be economically infeasible for Nielsen.[6]

As examples of its good faith and/or reasonable conduct, Nielsen notes that it continued to supply SI with NSS ratings for SI's syndicated programs even after it had become obvious that SI would not pay its bills.[7] *See* Dockery Dep. 143–46. Nielsen alleges that it also attempted to improve the quality of its ratings estimates of minority television viewers, by attempting to increase the level of participation among minority people-meter households that were included in the sample. *See* Hudak

produce measurements deemed reliable by Nielsen and in accordance with Nielsen standards. Nielsen shall exercise all reasonable efforts to correct errors or inaccuracies brought to its attention in reports provided hereunder if feasible. ¶ 5(a).

Contrary to SI's argument, this language does not comprise some undefined contractual duty to alter Nielsen's estimate methodology in order to correct errors that are inherent to any statistical survey utilizing sampling methods. *See* Hoynoski Aff. ¶¶ 9–11. Rather, Nielsen's argument that this provision of the Agreement concerns mistakes in the preparation of particular reports (for example, if Nielsen were to receive inaccurate station lineup information from a syndicator) is a far more persuasive reading of the literal meaning of ¶ 5(a). *See* Hudak Aff., Ex. 1, ¶ 5(f).

**6.** Should Nielsen be required to increase its sample size in order to achieve an error level equivalent to the total U.S. relative error with respect to a particular demographic category,

for example, African–American males 18–24, it would be necessary to increase the national people-meter households 77 times larger than it is now (i.e., grow from approximately 5,041 households to 389,567 households). This overwhelming burden is not required of Nielsen since all Nielsen customers, including SI, are told of the existence and sources of sampling errors beforehand. *See* Hoynoski Aff. ¶ 9; *see also Anning–Johnson Co. v. U.S. Occupational Safety and Health Review Comm'n*, 516 F.2d 1081, 1090 (7th Cir.1975) (finding that an Act which mandated a good faith effort did not require that an economically infeasible solution be taken).

**7.** Although SI complains about times when it failed to receive any ratings from Nielsen, it has not identified any instance in which Nielsen's decision not to issue a particular ratings estimate for a telecast of one of SI's programs was not in accordance with Nielsen's published reporting guidelines.

Aff. ¶ 12. Nielsen states it tried to educate advertisers on the use of such ratings in the purchase and sale of advertising time on programs like SI's. *Id.*

SI's claims that Nielsen acted in bad faith by providing inaccurate ratings are unsupported by the record. *See* Pl.'s Mem. Law. This Court finds that the record indicates Nielsen did not act in bad faith or unreasonably in the provision of its ratings estimates. In order to withstand summary judgment on this issue, SI must point to a genuine issue of material fact concerning Nielsen's faulty performance of a specific term of the Agreement. SI has failed to do so.

C. Unconscionability

■■■■ To determine whether a contract or contractual provision is unconscionable, the Court must look at the circumstances surrounding the agreement, the alternatives that were available to both parties at the time the contract was formed, the bargaining abilities of the parties, and whether the contract is illegal or against public policy. *See Children's Surgical Found., Inc. v. Nat'l Data Corp.*, 121 F.Supp.2d 1221, 1225 (N.D.Ill.2000). However, mere inequality of bargaining power is not enough to find a contract unenforceable. *Id.* In essence, courts will find a contract unconscionable only when it is so unfair, one-sided, and oppressive that it violates all notions of fair play and justice. *Id.; see also Ahern v. Knecht*, 202 Ill. App.3d 709, 150 Ill.Dec. 660, 563 N.E.2d 787, 792 (1990). "While unconscionability prevents oppression and unfair surprise, it is not used to disturb the allocation of risks because of superior bargaining power." *Children's Surgical Found., Inc.*, 121 F.Supp.2d at 1225.

■■■■ Plaintiff argues that the Agreement's exculpatory clause, as set forth in paragraph 5(d) ("limitation of liabilities"),

should be set aside because it is unconscionable. *See* Pl.'s Aff. in Opp.; *see also* Pl.'s Mem. Law. Illinois courts generally hold that contractual limitations, such as exculpatory provisions, are valid. *See First Financial Ins. Co. v. Purolator Security, Inc.*, 69 Ill.App.3d 413, 26 Ill.Dec. 393, 388 N.E.2d 17, 20 (1979). In effect, unless it is contrary to public policy of the State or there is a special social relationship that prevents upholding the agreement, exculpatory provisions are enforceable. *See White v. Village of Homewood*, 256 Ill. App.3d 354, 195 Ill.Dec. 152, 628 N.E.2d 616, 619 (1993).

■■■■ Thus, exculpatory clauses that are against public policy include those between (1) an employer and employee; (2) the public and those charged with a duty of public service; and (3) parties where there is a such a disparity of bargaining power that the agreement does not represent a free choice on the part of the plaintiff, such as a monopoly. *Id.* Courts will not interfere with contracts containing exculpatory clauses, unless there is a defect in the negotiation process such that a disparity in bargaining power denied one party a meaningful choice. *See Reuben H. Donnelley Corp. v. Krasny Supply Co.*, 227 Ill.App.3d 414, 169 Ill.Dec. 521, 592 N.E.2d 8, 11–12 (1991) (holding that without a defect in the negotiation process, contract will not be set aside merely because agreement results in bad bargain for one of contracting parties). A party seeking to void an exculpatory clause bears the burden to prove that it is unconscionable. *Id.* at 11.

In the instant case, there is no special relationship present between the parties nor is there an overriding public interest which would demand that the exculpatory clause be deemed unenforceable. SI's claim that the Agreement is oppressive, and that it is unreasonable for a de-facto

monopoly, such as Nielsen, to avoid liability regardless of the quality of the services rendered, is unpersuasive.

SI admits that at the time it became interested in obtaining a rating service, Arbitron Ratings Company was also available. *See* Dockery Dep. at 14. SI's principal himself claims 18 years of experience in the industry, SI Aff. at 4, suggesting a level of sophistication that belies a lack of understanding by SI and/or oppression or overreaching by Nielsen.[8]

 Moreover, this Court finds that it was not unreasonable for Nielsen to attempt to protect itself from liability, as it clearly did not hold itself out as a guarantor of the accuracy of the ratings estimates. Rather, Nielsen agreed to use all reasonable efforts to obtain the most accurate statistics practicable. *See, e.g., Donnelley Corp.*, 169 Ill.Dec. 521, 592 N.E.2d at 12 (finding exculpatory clause commercially reasonable where limitation of liability translates into savings for clients in the form of affordable prices). Accordingly, there is insufficient evidence that the limitation of liability clause in the Agreement was either procedurally or substantively unconscionable.

### D. Nielsen's Counterclaims

This Court has found that there was a valid and enforceable contract between SI and Nielsen and that Nielsen used reasonable efforts to furnish the ratings for SI. SI acknowledges no bases other than those contained in the instant Complaint for its failure to pay for services rendered. As such, the Court finds that SI remains liable for the unpaid NSS ratings over a period of 35 months. As the exact monetary amount is unknown[9], this case is hereby referred to Magistrate Judge Henry B. Pitman for an inquest to determine the appropriate damages, as well as the possible imposition of interest and costs.[10]

### III. Conclusion

For the aforementioned reasons, Defendant's motion for summary judgment against Plaintiff's claim and in favor of its counterclaim is hereby GRANTED. The case is referred to Magistrate Judge Pitman for the purposes of an inquest.

SO ORDERED.

---

8. Similarly, SI has adduced no evidence that the bargaining power disparity was such that the instant Agreement constituted an unlawful adhesion contract. Courts will determine that adhesion contracts are unlawful when the party with the superior bargaining power has taken unfair advantage of the "adherer" by making the desired product available only if the weaker party assents to the form contract. *See Eisele v. Ayers*, 63 Ill.App.3d 1039, 21 Ill.Dec. 86, 381 N.E.2d 21 (1978); *see also Abbott v. Amoco Oil Co.*, 249 Ill.App.3d 774, 189 Ill.Dec. 88, 619 N.E.2d 789, 794 (1993) (quoting *Star Finance Corp. v. McGee*, 27 Ill. App.3d 421, 326 N.E.2d 518 (1975)) ("A contract of adhesion is a standardized contract prepared entirely by one party, and which, due to the disparity in bargaining power between the draftsman and the second party, must be accepted or rejected by the second party on a 'take it or leave it' basis without opportunity for bargaining and under such conditions that the second party or 'adherer' cannot obtain the desired product or service save by acquiescing in the form of the agreement.")

9. Nielsen's counterclaim papers request $52,864.24 plus interest and costs while Michael Hudak, Nielsen's Vice President of Sales Development, puts the damages at $134,419.96. *See* Hudak Aff. ¶ 14.

10. Post-judgment interest is mandatory under Illinois law, absent a judicial stay. *See Eddings v. Board of Education*, 305 Ill.App.3d 584, 593–94, 238 Ill.Dec. 798, 712 N.E.2d 902 (1999). Costs shall be determined pursuant to Fed.R.Civ.P. 54.