FIRST NATIONAL BANK OF CICERO, Plaintiff and Counterdefendant-Appellee, v. LOUIS J. SYLVESTER, Defendant and Counterplaintiff-Appellant.

First District (2nd Division)   No. 1—88—3494

Opinion filed April 10, 1990.—Rehearing denied May 16, 1990.

Jenner & Block, of Chicago (Thomas R. Mulron, Jr., and Bradley P. Nelson, of counsel), for appellant.

Schwartz, Cooper, Kolb & Gaynor, of Chicago (Martin W. Salzman and Eric S. Rein, of counsel), for appellee.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:

The First National Bank of Cicero (the Bank) sued Allied Mechanical Industries, Inc. (Allied), and Louis J. Sylvester, Allied's president and sole shareholder, to collect approximately $380,000 due on a promissory note executed by Allied and guaranteed by Sylvester. Sylvester filed a counterclaim seeking $3.5 million in damages under a theory of promissory estoppel or, alternatively, as a result of an alleged breach by the Bank of a line of credit agreement with Allied. The trial court granted the Bank's motion for summary judgment on the amended complaint and on Sylvester's counterclaim and Sylvester appealed.

The issues raised are (1) whether summary judgment in favor of the Bank on the amended complaint was improperly granted; (2) whether summary judgment in favor of the Bank on Sylvester's counterclaim was improperly granted; (3) whether Sylvester waived certain claims by failing to raise them in the trial court; and (4) whether Sylvester had standing to bring the counterclaim against the Bank. We reverse and remand the cause to the trial court.

Before filing for bankruptcy in 1986, Allied was in the business of fabricating and installing heating, ventilating, and air-conditioning systems in commercial and industrial buildings. Sylvester started with Allied in 1945 and bought the company in 1972. Between 1972 and

1976, Sylvester was Allied's president and sole shareholder.

For 20 years prior to 1980, Allied banked at the Pioneer Trust and Savings Bank (Pioneer). Allied had a line of credit at Pioneer between $400,000 and $500,000. In June 1980, William T. Giova and another representative of the First National Bank of Cicero visited Sylvester for the purpose of soliciting Allied's banking business. Sylvester explained that he was looking for a line of credit at an established bank and described Allied's business and long-term credit needs. Sylvester explained that Allied needed "a line of operating credit" on an ongoing basis, so that funds would be immediately available, if necessary, to purchase equipment or otherwise operate the business. Giova asked Sylvester how much money Allied needed for its line of credit, Sylvester suggested $600,000, and was told that would be "no problem." Sylvester then agreed to move his accounts from Pioneer to the First National Bank of Cicero.

On June 20, 1980, the Bank's loan committee approved a $650,000 line of credit for Allied. The Bank gave Sylvester a written memorandum verifying the $650,000 line of credit, setting forth the formula for calculating the interest charged, and describing the security and guaranty required to secure the line of credit. There was no agreement as to the length of time the line of credit would be extended. The parties agreed, however, that "Allied could draw on the line of credit as needed." The line of credit was "asset-based," meaning that the Bank loaned money to Allied in exchange for a security interest in Allied's assets. The line of credit was originally secured by Allied's existing and future accounts receivable and inventory and by Sylvester's personal guaranty.

On several occasions from June 1980 through January 1986, Allied borrowed money under the line of credit. Allied borrowed a total of $1,040,000 on a revolving basis. Each time Allied borrowed money, Sylvester executed a promissory note on Allied's behalf for the amount of the loan. The promissory notes provided that amounts borrowed were due in 90 days, but up until January 1986, the Bank regularly renewed Allied's outstanding notes.

According to Sylvester, he communicated regularly with officers of the Bank concerning Allied's business, its work in progress, and the construction industry in general. Allied regularly supplied the Bank with financial statements and tax returns, invited the Bank to review its records, and submitted to an outside audit at the Bank's request. Allied regularly repaid the money it borrowed from the Bank, making regular payments on both principal and interest, and was "always current" on all of its loans. On April 13, 1981, Giova

stated in a letter to Allied's bonding agent that Allied "has both an unsecured and secured line of credit with us in a high 6 figure amount" and "is valued by us as an excellent account relationship and we are pleased to be of service."

According to William Spoo, a senior vice-president at the Bank, Allied's compliance with the Bank's requests for information were "sporadic" and, since December 1983, Allied's indebtedness "was in a work-out situation."

After a series of meetings in the fall of 1982, the Bank agreed to increase Allied's line of credit from $650,000 to $800,000. On October 4, 1982, Sylvester assigned to the Bank Allied's beneficial interest in a certain land trust, executed a new financing statement and security agreement pledging all of Allied's inventory, accounts receivable, and other property as security for both past and future advances to Allied, and agreed in writing to personally guarantee past and future loans to Allied up to the amount of $800,000. On November 18 or 19, 1982, the Bank consolidated Allied's indebtedness into two 90-day notes, one for $159,268.53 and the other for $550,000.

The remaining facts are largely disputed. The Bank alleged in its answer to Sylvester's counterclaim that Allied continued to draw on its line of credit through May 1983, but that after May 1983 the line of credit ceased to exist and was extended only "on 90-day payment terms." In its reply brief in support of its motion for summary judgment, the Bank alleged that the line of credit had been terminated one year earlier, in May 1982. In any event, the Bank has never alleged that it informed Sylvester or Allied specifically that it had terminated the line of credit. Spoo stated in his affidavit, however, that "[s]ince December, 1983, [he] advised Sylvester, on numerous occasions, that the Allied indebtedness was in a work-out situation and that refinancing should be sought through other financial institutions." Sylvester denied in his affidavit that Spoo or any other representative of the Bank gave him such advice.

On this appeal, the Bank asserts that the termination of the line of credit agreement coincided with the loan consolidation on November 18 or 19, 1982. The $159,268.53 note was paid in full on December 6, 1983. The $550,000 note required Allied to make monthly payments of $3,000 and contained no provisions for the borrowing of additional money. The Bank asserts that there is evidence in Sylvester's deposition testimony that he understood in August 1984 and again in February 1986 that his line of credit had been terminated. At his deposition, Sylvester testified that in August 1984 he sought additional funds to meet his payroll, went to the Bank, and requested a

"separate line of credit." He also testified that in February 1986, when he wanted to borrow $200,000, he "felt that the [consolidated] note should stand as it was" and so requested "another line of credit."

Sylvester asserts that in the spring of 1984, in the midst of a recession in the construction industry, he spoke with Spoo, telling him that if his line of credit would continue to be available, he would personally invest additional money into Allied and would spend the money necessary to keep Allied's key personnel on the payroll so that Allied would be ready to take advantage of improved business conditions when the industry turned around. According to Sylvester, Spoo agreed with the plan and never once said that the line of credit agreement had been terminated. On April 14, 1984, and October 24, 1984, Sylvester executed personal guarantees in consideration of the Bank's agreement to continue the line of credit. Sylvester asserts that in reliance on Spoo's representations, he invested $440,000 of his own money into Allied.

In its motion for summary judgment, the Bank admitted that the April 14, 1984, guaranty was executed by Sylvester "in consideration of advances made or thereafter to be afforded to Allied." The Bank, however, asserts that Spoo specifically denied Sylvester's request in 1984 for additional funding, never made any agreement at that time to lend Sylvester money in the future, and stated only that "[w]hen you need it, we'll discuss it."

In November 1985, Sylvester told the Bank that Allied was bidding on work to be performed at a Ramada Inn under construction in Naperville, Illinois. Although Allied was awarded a contract, the Bank denies that any Bank representative saw the contract or was aware of its terms. The Bank asserts that Sylvester made a general request for money to cover the Ramada Inn job, but was turned down and told that the matter would be discussed when Allied made a specific request.

In January 1986, Allied specifically requested a $200,000 line of credit for the Ramada Inn project. As noted above, Sylvester stated at his deposition that he requested "another line of credit" because he felt that the consolidated note evidencing his earlier indebtedness "should stand as it was." Sylvester told the Bank that he expected to earn a profit of $100,000 on the project and that he believed the construction industry was turning around. Allied had already drawn about $400,000 from the line of credit and there is some dispute as to whether Allied was in default on any of its loans at that time.

Sylvester asserts that in February 1986, the Bank told him for

the first time that it would not loan Allied the $200,000 for the Ramada Inn project because the Bank was no longer in the business of making construction loans. Sylvester offered to further collateralize the loan, but the Bank still refused to lend Allied the money.

Sylvester maintains that because the Bank refused to finance the Ramada Inn project without prior notice, Allied was unable to obtain alternative financing and was forced to default on its subcontract. Allied was subsequently unable to continue in business and eventually filed for bankruptcy. Sylvester claims he lost his entire investment of approximately $3 million.

The Bank refused to renew Allied's note when it became due on April 3, 1986. On July 8, 1986, after Allied refused to pay the note, the Bank sued Allied and Sylvester, as guarantor, for the balance due on the note, plus interest, attorney fees, and costs. Sylvester counterclaimed, alleging that the Bank wrongfully refused to extend credit for the Ramada Inn project after inducing him to rely on representations that a line of credit was available. The trial court granted the Bank's motion for summary judgment on its amended complaint and on Sylvester's counterclaim and this appeal followed.

I

Sylvester maintains first that the trial court improperly granted summary judgment in favor of the Bank on the amended complaint. He argues that the Bank breached an enforceable line of credit agreement with Allied by refusing in bad faith to loan Allied the money for the Ramada Inn project in February 1986. The Bank's conduct, he maintains, released him from his guaranty. Sylvester argues that, at a minimum, questions of fact were presented precluding summary judgment.

The Bank relies on a single "termination" theory as support for the trial court's decision. The Bank argues that the trial court granted summary judgment in its favor, not because the line of credit agreement was unenforceable, but rather because the agreement had been terminated some time before February 1986. This conclusion, the Bank maintains, is amply supported by the record. Because there was no agreement in effect at the time the loan was refused, the Bank continues, the loan was properly denied and Sylvester was not released from his guaranty.

We believe, however, that whether the line of credit agreement had been terminated by the time of Allied's February 1986 loan request was a question for the trier of fact. The Bank itself is seemingly unsure of the date of termination, arguing first that the agree-

ment terminated in 1983 and then arguing that the agreement terminated in 1982 when Allied's loans were consolidated. In any event, each contention is contradicted by evidence in the record that in 1984 Sylvester executed additional personal guarantees to keep the line of credit open and discussed the terms of the agreement with William Spoo.

Moreover, contrary to the Bank's assertion, Sylvester's deposition testimony that in February 1986 he sought "another line of credit" and evidence that Sylvester requested financing in 1984 and Spoo stated "[w]hen you need it, we'll discuss it," was not sufficient to support summary judgment in favor of the Bank. Sylvester has consistently maintained in this case that he believed up until February 1986 that Allied had an open line of credit with the Bank. He asserts that by requesting "another line of credit," he simply meant that he should receive a separate promissory note. He argues that Spoo's response to his 1984 request was consistent with the terms of the asset-based lending agreement under which the Bank determined whether Allied has pledged sufficient security before extending additional credit. We agree that the meaning of Sylvester's statements is open to interpretation. It follows that the question of whether the line of credit agreement had terminated should have been left for the trier of fact.

We note that in addition to the Bank's termination theory, the trial court's decision may also be affirmed on the ground that the line of credit agreement was unenforceable, or on the ground that the Bank did not act in bad fact. As discussed below, however, we believe that each theory presents a material question of fact precluding summary judgment.

■ The material terms of a line of credit agreement include the intended duration of the agreement; the applicable rate of interest or the basis for ascertaining the rate of interest; the duration or date for maturity of the loans; and the mode or rate of repayment. (*Carrico v. Delp* (1986), 141 Ill. App. 3d 684, 688, 490 N.E.2d 972; *McErlean v. Union National Bank* (1980), 90 Ill. App. 3d 1141, 1146, 414 N.E.2d 128.) In this case, the trial court stated that the line of credit agreement "cannot be considered a contract since it lacks any indication as to duration." Although it is not clear whether this conclusion was the basis for the trial court's decision, for the reasons given below, the question of the agreement's duration should have been left for the jury.

■ Ordinarily, where no definite time is fixed during which an executory contract shall continue in force, it is terminable at the will of

either party. (*Gage v. Village of Wilmette* (1924), 315 Ill. 328, 146 N.E. 325; *Carrico v. Delp*, 141 Ill. App. 3d at 688-89.) This rule does not apply where the contract is not fully executory. (See *Carrico v. Delp*, 141 Ill. App. 3d at 689.) Rather, when consideration for a promise requiring continuing performance has been partly executed, a court will be reluctant to hold that the promise is determinable at the promisor's pleasure. (*Carrico v. Delp*, 141 Ill. App. 3d at 689; 1 S. Williston, Contracts §38, at 117 (3d ed. Jaeger 1957).) In such cases, the duration of the agreement is determined by the agreement as a whole, based on what is reasonable, and is a question for the trier of fact. See *Carrico v. Delp*, 141 Ill. App. 3d at 689; *Ricke v. Ricke* (1980), 83 Ill. App. 3d 1115, 405 N.E.2d 351.

In *Carrico*, for example, the plaintiffs maintained that the defendant bank wrongfully refused to provide financing under a line of credit agreement established to provide operating capital for the plaintiffs' farm. The bank argued that the agreement was unenforceable because it lacked a durational term, and the trial court agreed, dismissing the complaint. On appeal, the court rejected the bank's argument, however, because the plaintiffs had pledged collateral to secure existing and future obligations. The court stated: "Construing the contract to be terminable at will would mean that the plaintiffs obtained no benefit from pledging the additional security." (*Carrico v. Delp*, 141 Ill. App. 3d at 689.) The court concluded that the duration of the agreement was a question for the trier of fact.

In this case, the record shows that, like the plaintiffs in *Carrico*, Allied pledged additional collateral as security in 1982 and again in 1984. In 1982, Allied assigned to the Bank Allied's beneficial interest in a land trust. In April 1984, Sylvester executed additional personal guarantees to allow Allied to obtain credit from the Bank "from time to time." The guarantees were to be applied to debts "now existing or hereinafter created or arising." To hold that the line of credit agreement was terminable at will despite the additional collateral pledged by Allied would be contrary to *Carrico* and to settled principles of contract law. As in *Carrico*, the duration of the line of credit agreement was a question for the trier of fact.

Finally, a question of fact was presented regarding the Bank's alleged breach of the line of credit agreement's covenant of good faith and fair dealing. Every contract implies good faith and fair dealing between the parties. (*Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 286, 154 N.E.2d 683.) Good faith between the contracting parties requires the party vested with contractual discretion to exercise it reasonably, not arbitrarily, capriciously, or in a manner incon-

sistent with the reasonable expectations of the parties. *Carrico v. Delp*, 141 Ill. App. 3d at 690.

In this case, the question of the Bank's good faith was not considered by the trial court. It is plain that the Bank has some degree of discretion in extending credit to Allied, because under the agreement, the Bank must be satisfied that Allied's inventory, accounts receivable, and other assets are sufficient to secure the additional money loaned. Whether the Bank exercised its discretion reasonably, however, was a question for the trier of fact. See *Osten v. Shah* (1982), 104 Ill. App. 3d 784, 786, 433 N.E.2d 294.

In considering whether the Bank acted reasonably, the trier of fact should consider, at a minimum, the profitability of Allied's business and any evidence that Allied was not in default at the time the credit was refused. (See, *e.g.*, *Champaign National Bank v. Landers Seed Co.* (1988), 165 Ill. App. 3d 1090, 1098, 519 N.E.2d 957; *Reid v. Key Bank of Southern Maine, Inc.* (1st Cir. 1987), 821 F.2d 9.) Certainly, the reason given by the Bank in this case for refusing the February 1986 request, namely, that it "was not making construction loans," is not sufficient to support summary judgment in favor of the Bank, given the evidence in the record that the Ramada Inn project would have been profitable and Allied was not in default at the time of the request.

## II

Sylvester maintains next that the trial court improperly granted summary judgment in favor of the Bank on the counterclaim. He argues that he is entitled to recover damages either because the Bank breached an enforceable line of credit agreement or under the doctrine of promissory estoppel.

Initially, with respect to whether the Bank breached an enforceable line of credit agreement, for the same reasons discussed in part I, we believe there were questions of fact precluding summary judgment.

With respect to Sylvester's promissory estoppel argument, we note that the elements of promissory estoppel are (1) a promise, (2) which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promissee, (3) which induces such action or forbearance, and (4) which must be enforced in order to avoid injustice. (*Lawrence v. Board of Education of School District 189* (1987), 152 Ill. App. 3d 187, 201, 503 N.E.2d 1201.) Each of these elements presents a question for the trier of fact. (*Bank Computer Network Corp. v. Continental Illinois*

*National Bank & Trust Co.* (1982), 110 Ill. App. 3d 492, 500, 442 N.E.2d 586.) An express promise is not required. (*Bank Computer Network Corp. v. Continental Illinois National Bank & Trust Co.*, 110 Ill. App. 3d at 497.) Rather, the promise may be inferred from conduct and words. See *Lawrence v. Board of Education of School District 189*, 152 Ill. App. 3d at 201.

■ In this case, the trial court concluded that "[t]he actions of the parties *** are inconsistent with any belief that the [Bank] had unambiguously agreed to further fund the lending obligation." The trial court apparently based its conclusion on Spoo's statements that the relationship between Allied and the Bank was in a "work-out situation," Spoo's statement "[w]hen you need it, we'll discuss it" in response to Sylvester's loan request, and Sylvester's deposition testimony that he sought "another line of credit" for the Ramada Inn project. As noted in part I, however, this evidence was not sufficient to support summary judgment in favor of the Bank on the issue of the termination of the line of credit agreement. Certainly, if there was a question of fact precluding summary judgment on the issue of whether the line of credit agreement was in effect in February 1986, there was also a question of fact precluding summary judgment on the issue of whether the Bank merely promised to continue financing.

The trial court did not consider the other elements of promissory estoppel, but it is plain that there were questions of fact precluding summary judgment regarding these elements as well. There is uncontroverted evidence that Allied transferred its accounts to the Bank from the Pioneer Trust & Savings Bank in reliance on the line of credit agreement, that Sylvester invested money in Allied in 1984 following what he believed were reassurances from the Bank that the line of credit was open, and that Allied did not seek financing from other sources for the Ramada Inn project. A jury could reasonably infer the elements of promissory estoppel from this evidence.

Although we believe summary judgment on the counterclaim was improvidently granted, we express no opinion as to the extent of recoverable damages or whether any damages recovered should inure to the benefit of Allied's creditors under the Bankruptcy Code.

### III

■ The Bank maintains that Sylvester waived his breach of contract and promissory estoppel claims by failing to raise them in the trial court. The Bank argues that the only claim raised in the trial court was a claim for breach of a written contract, so that Sylvester cannot now raise issues based on any oral agreements or the doctrine

of promissory estoppel. We disagree.

The record shows that Sylvester raised the breach of contract and equitable estoppel issues in the trial court. The Bank admitted as much in its response to Sylvester's motion for reconsideration. The record also shows that the trial court considered both claims, finding that an agreement did not exist in February 1986 and that the elements of promissory estoppel had not been established. Finally, there is no support for the Bank's contention that Sylvester's position on this appeal is not based on a written contract. Sylvester argues on this appeal, as he did in the trial court, that the Bank breached the written line of credit agreement. Sylvester relies on custom, course of dealing, and partial performance only to establish that the contract is not unenforceable because it lacks a durational term.

## IV

Finally, the Bank maintains that Sylvester lacked standing to bring a counterclaim based on breach of contract because he did not suffer a direct injury. The Bank also maintains that Sylvester's affirmative defense to the amended complaint was not raised in a timely fashion.

We conclude, however, that the Bank waived the standing issue by failing to raise it in the trial court. (See *Local Union 134, International Brotherhood of Electrical Workers v. Chicago Transit Authority* (1979), 68 Ill. App. 3d 855, 386 N.E.2d 303.) In any event, guarantors who suffer "direct injury" have standing to "pursue their own remedies." (See *Mid-State Fertilizer Co. v. Exchange National Bank* (7th Cir. 1989), 877 F.2d 1333.) Here, Sylvester alleges that he lost his investment in Allied as a result of the Bank's breach of its duty of good faith and fair dealing. There is no contrary evidence in the record, no doubt because the issue was not raised below.

The Bank likewise waived its pleading objection to the defense raised by Sylvester to the amended complaint. Sylvester raised the defense of the Bank's bad faith in response to the Bank's motion for summary judgment. The Bank failed to object on the motion for summary judgment and cannot argue for the first time on appeal that the defense was untimely.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and this cause is remanded to the trial court.

Reversed and remanded.

BILANDIC and SCARIANO, JJ., concur.