**Belinda PETERSON, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**H & R BLOCK TAX SERVICES, INC., a Missouri corporation, and John Does 1–10.**

**No. 96 C 6647.**

United States District Court, N.D. Illinois, Eastern Division.

July 10, 1997.

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Richard Joseph Doherty, Edelman & Combs, Chicago, IL, for Plaintiff.

Theodore John Low, Altheimer & Gray, Chicago, IL, David H. Latham, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Belinda Peterson and the putative tax class[1] ("Peterson") allege that defendants H & R Block Tax Services, Inc. and ten of its corporate officers (collectively, "Block") solicited and charged customers for Block's "Rapid Refund" tax services despite knowing that these services were unavailable. Peterson claims that this scheme was intended to defraud Block's customers, and has made it the subject of a six-count complaint. Count I alleges that Block breached the terms of a contract to provide Peterson with accurate tax advice and breached obligations of good faith and fair dealing implied in the contract. Counts II and III add RICO claims; Count IV asserts a violation of the Illinois Consumer Fraud and Deceptive Practices Act; Count V claims breach of fiduciary duty; and Count VI seeks restitution. Block's motion to dismiss Counts I and V for failure to state a claim upon which relief may be granted is presently before the Court.

## LEGAL STANDARDS

A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Triad Assoc., Inc. v. Chicago Housing Auth.,* 892 F.2d 583, 586 (7th Cir.1989). When considering a motion to dismiss, the Court views all facts alleged in the complaint, as well as any inferences reasonably drawn from them, in the light most favorable to the plaintiff. *Mosley v. Klincar,* 947 F.2d 1338, 1339 (7th Cir.1991). A motion to dismiss will be denied unless it appears beyond doubt that the plaintiff can prove no facts which would entitle him or her to relief. *Conley v. Gibson,*

---

**1.** This Court granted Peterson's motion for class certification in a companion order issued today.

355 U.S. 41, 45, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

### RELEVANT FACTS

The following facts are drawn from Peterson's amended complaint. Block provides tax return preparation services to the public and, as part of that business, offers electronic tax return filing and refund anticipation loans ("RALs"). Amd. Cmplt. ¶ 10. These services are advertised and represented to the public as "Rapid Refund." *Id.* Electronic filing means transmitting tax returns to the IRS via computer rather than through the mail. RALs are loans issued by banks in the amount of the taxpayer's anticipated federal tax refund. Participating national banks contract with Block to make RALs to Block's electronic filing customers, and repayment is secured by the actual refund from the IRS. *Id.* For payment of a specified fee, Block's electronic filing customers can apply for RALs while at a Block office obtaining tax preparation services. *Id.* ¶ 18. Block allegedly endeavors to provide each customer with professional advice on their eligibility for RALs. *Id.* ¶ 17.

In January 1995, Peterson entered a Block office located in Forest Park, Illinois. *Id.* ¶ 11. With her, she brought the information that Block would need to complete her 1994 state and federal income tax returns. During her visit, a Block employee presented Peterson with a pamphlet entitled "Service-Plus," which informed Peterson, among other things, that Block would "[d]escribe how Rapid Refund works for you." [2] *Id.* ¶ 16, Ex. B.[3] Block then gave Peterson a schedule of RAL fees corresponding to the amount and timing of anticipated refunds. *Id.* ¶ 18, Ex. C. The schedule explained how Peterson could obtain the greater portion of her refund in the fastest time by paying $155.50—the highest RAL fee. By paying $100.50—the second highest fee—Peterson could obtain a modest portion of her refund in the fastest time, and the balance within three weeks. Finally, Peterson could obtain the entire balance of her refund within three weeks by paying $51.50—the lowest fee. *Id.* ¶ 20. Although the Fact Sheet warns that the bank issuing the RAL may limit loans in some cases or reduce the loan if the taxpayer claims an earned income tax credit (EITC),[4] the Fact Sheet does not anticipate refunds taking longer than three weeks. *Id.*

Based upon the representations that Block made in these materials, Peterson authorized Block to start preparing her tax returns *Id.* ¶ 23. In the process, Block determined that Peterson was eligible for an EITC. *Id.* ¶ 21. In addition to purchasing tax preparation services, Peterson applied for Block's RAL program.[5] *Id.* ¶ 23. She paid a $100.50 fee, so that she could receive an immediate refund of $399.50 and a second refund check of $2,436.00 [6] *Id.* Block informed Peterson that

2. The pamphlet also assured Peterson that Block had completed her return and reported all income; that all appropriate adjustments, deductions, and credits had been claimed; and that all payments had been identified. It then explained that "[o]ur service doesn't end here"; in addition to pledging to describe "how Rapid Refund works for you," the pamphlet said Block would explain what happens next with the refund and answer any questions; plan for next year's refund; provide record keeping materials; and explain its service and guarantees. Amd. Cmplt. Ex. B.

3. Peterson has attached four exhibits, lettered A through D, to her amended complaint. This Court may consider documents attached to the complaint if they are referred to in the complaint and central to the plaintiff's claims. *Siefken v. Village of Arlington Heights,* 65 F.3d 664, 666 (7th Cir.1995). Exhibits B and C comprise the alleged contract at issue and Exhibit D is evidence of its alleged breach, while Exhibit A is central to Peterson's breach of fiduciary duty claim. Therefore, Peterson's four exhibits are properly before the Court.

4. The Earned Income Tax Credit is an advance refundable credit based on the taxpayer's earned income. The amount of the credit is a specified percentage of the taxpayer's earned income, up to a certain amount. The applicable percentage and amounts vary according to IRS tables, which account for variables such as inflation and the number of the taxpayer's qualifying children. Amd. Cmplt. ¶ 30. For persons qualifying, the EITC makes up a substantial portion of their eventual refund. *Id.* ¶ 31.

5. Her application for RAL was approved by the contracting bank. Def. Br. Ex. 1.

6. The latter two figures are individualized, tailored to Peterson's personal tax status. Amd. Cmplt. ¶ 19.

she would get the second refund check in two or three weeks. *Id.* ¶¶ 22, 23. She did not.[7] *Id.* ¶ 28. Instead, Peterson's refund was delayed as a result of the IRS's decision to review all 1994 tax year returns claiming an EITC in an effort to ·combat fraudulent EITC claims. *Id.* ¶ 28, Ex. D. The IRS sent Peterson a letter on February 20, 1995, a few weeks after she had filed her return. *Id.* The letter explained that the remainder of her refund—her second refund check— would be delayed for at least eight weeks because she had claimed an EITC. *Id.*

At the time that it prepared Peterson's tax return and charged her for its Rapid Refund service, Block allegedly knew that Peterson could not obtain a Rapid Refund because refunds for customers claiming an EITC were being delayed by the IRS for at least eight weeks. *Id.* ¶¶ 24, 33. In short, Peterson claims that Block knew persons claiming EITCs were ineligible for RAL but charged them for it anyway. Although Block allegedly failed to disclose this information to its customers, Block later informed its shareholders. *Id.* ¶ 35. In its Form 10–K dated July 28, 1995, Block stated, "During the 1995 tax season, the IRS made further changes to its electronic return processing systems and procedures to crack down on taxpayer fraud believed to be associated with the earned income tax credit claimed on returns. These changes resulted in delays in the IRS's issuance of refunds associated with the EITC ... RAL's were not made available on the portion of the refund amount attributable to the EITC." *Id.* ¶ 35. Ex. A.

In Count I of her complaint, Peterson contends that Block breached a contract to provide accurate tax advice, as well as the obligations of good faith and fair dealing implied in the contract, by selling the Rapid Refund service to customers who were not eligible for it. Peterson further claims, in Count V of her complaint, that Block breached its fiduciary duty as a professional tax adviser to the class members by misrepresenting RAL services for the purpose of advancing Block's own interests. Block moves to dismiss both Counts under Rule 12(b)(6) for failure to state a claim.

## ANALYSIS

### I. Count I—Breach of Contract

Peterson's breach of contract claim alleges that Block contracted with her to provide accurate tax advice, particularly with regard to RAL availability, through its Service*Plus* pamphlet and RAL Fact Sheet. In exchange, Peterson paid the $100.50 RAL fee, expecting to receive this service as promised. By soliciting and charging Peterson for RAL when it knew she did not qualify for the service, Block allegedly breached its express contractual obligations, as well as covenants of good faith and fair dealing implied in the contract.

Block responds initially that the Court should dismiss Count I because Block has no contract with Peterson; rather, the only contract formed was the loan contract between Peterson and the lending bank. After all, Block points out the Bank is clearly identified in both the loan contract and RAL application as the lender—in other words, as the entity responsible for issuing the RALs. Moreover, the RAL Fact Sheet warns that the Bank has the authority to limit loans or reduce the amount of the RAL for applicants claiming an EITC. Consequently, Block claims, any promises that Peterson would obtain her refund by a specific date fall exclusively on the Bank's shoulders.

A careful examination of the pleadings reveals that Block misperceives Peterson's breach of contract claim. The amended complaint does not allege that the lending bank or Block breached the *loan* contract. Nor does Peterson complain that the Bank limited her loan or reduced her RAL based on the fact that she claimed an EITC— indeed, the bank accepted her RAL application without such conditions. Most importantly, Peterson does not allege that her claim is based upon either the Bank or Block's failure to deliver her full tax refund within a certain amount of time. What Pe-

---

7. Peterson had previously used the services of Block, including Rapid Refund, on two or three occasions. Each time she claimed an EITC and received her RAL within three days of filing her return. Amd Cmplt. ¶ 15.

terson claims is that, based on the language of Service*Plus* pamphlet and RAL Fact Sheet, Block had a written contractual obligation to advise her accurately on tax matters. She alleges that Block, not the lending bank, prepared her tax forms, determined she was eligible for an EITC, and promised to render her accurate tax advice when it pledged in the Service*Plus* pamphlet, among other things, to 1) describe how Rapid Refund would work for her and 2) explain what would happen next with her tax return. Since Peterson was claiming an EITC, describing how Rapid Refund would work for Peterson amounts to explaining that it wouldn't. Instead, Block solicited Peterson's interest in RAL by showing her the Fact Sheet and sold her the service for a hefty fee, all the while aware that Peterson could not take advantage of RAL. The Bank had no part in making these representations; it does not purport to dole out tax advice, sell the RAL service, or opine on how RAL works for a particular customer. Because a plaintiff need only plead a claim for relief "under any set of facts" consistent with the complaint, we will not force Peterson to accept Block's characterization of her contract claim. *See Rice v. Panchal,* 65 F.3d 637, 639 (7th Cir. 1995) (paramount policy of the well-pleaded complaint rule is that the plaintiff is master of her complaint). We therefore find that Peterson's claim is based on the alleged written service contract (i.e., the Service*Plus* pamphlet) with Block for tax advice.

Block's sole legal authority on this issue is a case also involving Block's RAL service, which granted summary judgment on a claim that Block had breached a contract promising RAL check deposits by a specific date. *See Washington v. H & R Block, Inc.,* No. 90 CH 2312 (Cook County, Ill. Jan. 5, 1995). This case is unavailing. The *Washington* plaintiffs' breach of contract theory differs markedly from Peterson's—it was based entirely on the premise that Block had guaranteed the plaintiffs that they would receive their Rapid Refunds by a specific date. The *Washington* court found that Block never guaranteed a specific date for refunds; Block merely told the plaintiffs when they could "expect" their checks to come in. Tr. at 7, 11. The court further determined that the relevant agreement addressing refund timing was the loan contract between the plaintiffs and the lending bank. *Id.* at 11. Here, by contrast, the alleged contract concerns certain customers' eligibility for RAL in the first place, not refund timing. And unlike the equivocal timing estimates in *Washington,* Block's obligation to tell customers how RAL would work for them is unqualified. Because Peterson's claim is based on Block's alleged obligation to provide accurate tax advice, not on the loan contract with the Bank, the *Washington* court's opinion has no application here.[8]

■ Block next argues that, assuming the loan contract fails to dispose of Peterson's contract claim, we should still dismiss Count I because Peterson has not set forth sufficient facts giving rise to a service contract between her and Block for tax advice. To state a cause of action for breach of contract under Illinois law,[9] a plaintiff "must allege the existence of the contract, including allegations indicating an offer, acceptance and consideration, the plaintiff's performance of all contractual conditions required of him, the fact of the defendant's alleged breach, and the existence of damages as a consequence." *Nuccio v. Chicago Commodities, Inc.,* 257 Ill.App.3d 437, 443, 195 Ill.Dec. 670, 675, 628 N.E.2d 1134, 1139 (1993); *see Wait v. First Midwest Bank of Danville,* 142 Ill.App.3d 703, 706–09, 96 Ill.Dec. 516, 520–22, 491 N.E.2d 795, 799–801 (1986); *see also Strze-*

---

**8.** We also note that the requirements for surviving a motion to dismiss are much less stringent than on summary judgment, which was the procedural posture facing the *Washington* court (although state procedural rules governed that case). Here, Peterson's facts are assumed true and examined only for purposes of stating a claim for relief. On summary judgment, however, the plaintiff must point to specific evidence that precludes judgment as a matter of law, *see Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453

(7th Cir.1994), and the court views all facts through the "prism of the substantive evidentiary burden," *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), which lies on the plaintiff in a breach of contract action.

**9.** The parties do not dispute that Illinois law applies to Peterson's state law claims.

*lecki v. Schwarz Paper Co.,* 824 F.Supp. 821, 829 (N.D.Ill.1993) (plaintiff satisfies pleading requirements of Fed.R.Civ.P. 8 by alleging that a contract was formed, plaintiff performed it, defendant breached it, and plaintiff suffered damages; detail need only be sufficient to enable defendants to identify the contract at issue). According to Block, the only contract that could possibly have been formed between Peterson and Block was for tax preparation and electronic filing services, and Peterson does not contend that those services were deficient in any way.

We find that, under the broad pleading standards of Fed.R.Civ.P. 8, Peterson's complaint alleges the requisite elements for a contract to render tax advice. First, Peterson pleads the existence of a contract that offers services beyond simply preparing tax forms. Block's Service*Plus* pamphlet begins with the basics, informing Peterson that it has prepared her 1995 tax returns and ensuring that: (1) the return is complete and all income has been reported; (2) all appropriate adjustments and deductions have been claimed; and (3) all relevant credits and payments have been identified and claimed, including the EITC. But Service*Plus* does not end there; it goes on to promise that Block will: (1) explain what happens next with your tax return; (2) answer any questions you may have; (3) plan for the refund you want next year; (4) describe how Rapid Refund works for you; and (5) provide record keeping material. It is this latter set of services that indicates Block is knowledgeable in tax matters and can ably answer its customers' tax questions, explain what the IRS will do with their tax returns, offer advice on obtaining tax refunds in the future, and explain the inner workings of Rapid Refund.

Peterson likewise sufficiently alleges acceptance of Block's offer to provide tax advice, as well as consideration and perfor-

mance. Peterson authorized Block to proceed with preparing her tax return, and, after Block presented her with the Service*Plus* pamphlet and RAL Fact Sheet, paid the $100.50 fee in order to receive an immediate refund of $399.50 and a second refund check of $2,436.00 on an expedited basis. This payment, Peterson alleges, was based upon Block's explanation of how Rapid Refund could work for her. It also served as consideration, having worked as a monetary benefit to Block and a financial detriment to Peterson, *see Wait,* 142 Ill.App.3d at 708, 96 Ill.Dec. at 522–23, 491 N.E.2d at 801–02, and, besides filling out the loan application, was the only act required for Peterson's performance.

Third, Peterson adequately alleges that Block breached the contract by knowingly providing false tax advice. By the time Block prepared Peterson's tax return and sold her Rapid Refund services, it had already determined that she was eligible for an EITC. The key allegation, whose truth we must assume in this opinion, is that Block also knew, at the same time, that the IRS was delaying—for a minimum of eight weeks—refunds on returns claiming the tax credit. Armed with this knowledge, Block had the obligation, as part of its duty to explain how Rapid Refund would work for Peterson, to tell her that she was ineligible to receive the principal benefit of RAL—obtaining her second refund check on an expedited basis. But it never did so. As a consequence, Peterson paid for a service she had no hope of receiving, expending $100.50 for an expedited check worth only $399.50. She suffered damages by forfeiting the portion of the fee attributable to securing an expedited second refund check worth $2436.00 and losing the time value of her money while it languished in the government's coffer.[10]

**10.** Block proffers one more argument, which merits only footnote discussion, in support of its claim that the only contract it had with Peterson was one for tax preparation and filing services, not tax advice. According to Block, the past tense language in the Service*Plus* pamphlet reveals that Block does not give it to customers until after preparing and electronically filing their tax returns. At this point, Block has already performed its contractual obligations; the subsequently issued pamphlet cannot thrust upon

Block any additional duties. But this argument is premised on an erroneous assumption—that preparing and filing Peterson's tax return was tantamount to full contractual performance. We rejected this assumption in finding that Service*Plus* promised something more. In light of Service*Plus*'s offer to counsel Peterson as to how Rapid Refund "works" for her, Block did not discharge its contractual obligations simply by preparing and filing Peterson's return. More-

We acknowledge that Peterson's express contract claim is somewhat tenuous. The Service*Plus* pamphlet does not explicitly promise that Block will render accurate tax advice. Nor does it state that Block will accept responsibility for circumstances outside its control that later undermine its advice on how RAL "works" for a particular customer. What is contemplated by Service-*Plus*'s pledge to explain how RAL "works" for someone is honesty and forthrightness in that explanation. In this respect, Peterson's breach of contract claim is saved only by her allegation that Block knew before telling Peterson about its RAL service that the IRS was taking action that would render her ineligible for RAL—in essence, a deliberate breach of its promise to advise Peterson honestly about how RAL would work for her. The liberal federal pleading rules governing breach of contract claims require us to accept this allegation's truth. And Peterson is required only to allege facts sufficient to notify Block that the service contract was breached. *See Murphy v. White Hen Pantry,* 691 F.2d 350, 352 (7th Cir.1982) (under lenient federal pleading rules, breach of contract claim need only plead facts sufficient to notify the defendant that an agreement has been violated); *see also Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957) (complaints are to be construed liberally under the notice pleading theory of the Federal Rules of Civil Procedure). We cannot say beyond doubt that she has failed to do this.

■ Moreover, Peterson's breach of contract claim is redeemed by the fact that Peterson does not rely solely on the terms of the Service*Plus* pamphlet. Peterson also asserts a breach of the implied contractual obligation of good faith and fair dealing, which Illinois law incorporates into every contract. *Oil Express Nat'l, Inc. v. Burgstone,* 958 F.Supp. 366, 369 (N.D.Ill.1997); *Northern Trust Co. v. VIII South Michigan Assocs.,* 276 Ill.App.3d 355, 367, 212 Ill.Dec. 750, 759, 657 N.E.2d 1095, 1104 (1995); *Dayan v. McDonald's Corp.,* 125 Ill.App.3d 972, 989–90, 81 Ill.Dec. 156, 169, 466 N.E.2d 958,

971 (1984). Although this covenant "has never been an independent source of duties for the parties to a contract," it is frequently invoked when one of the contracting parties is vested with broad discretion in contract performance, *Oil Express Nat'l,* 958 F.Supp. at 369, forcing the "dependent party [to] rely on the party in control to exercise that discretion fairly." *Dayan,* 125 Ill.App.3d at 990, 81 Ill.Dec. at 169, 466 N.E.2d at 971. In short, the obligation of good faith "requires the party vested with contractual discretion to exercise it reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *First Nat'l Bank v. Sylvester,* 196 Ill.App.3d 902, 910–11, 144 Ill.Dec. 24, 30, 554 N.E.2d 1063, 1069 (1990); *see Oil Express Nat'l,* 958 F.Supp. at 369. "When such discretion is abused by a party in bad faith, then, a cause of action may arise derivatively from the duty of good faith and fair dealing." *Oil Express Nat'l,* 958 F.Supp. at 369.

■ To plead a breach of the implied covenant of good faith and fair dealing, Peterson must allege 1) that Block had wide discretion in contract performance and 2) that it exercised this discretion in bad faith. *Id.* at 369–70. She meets these requirements with the contentions that Block deliberately dispensed erroneous tax advice by soliciting and charging unsuspecting customers for a service Block knew they could never obtain.

First, Block was plainly vested with broad discretion in providing Peterson accurate tax advice. Its tax return preparation and RAL business primarily serves customers who, like Peterson, are not wealthy (with an income sufficiently low to claim an EITC) and are relatively unsophisticated in tax matters (needing assistance to fill out tax forms). Consequently, these customers depend on Block's expertise, reposing in Block wide discretion to render appropriate tax advice. For example, Block determines for its customers what adjustments to income and deductions to make, and what credits and payments to identify and claim. And only Block knows what additional services, based on this

over, this key language is written in the future tense, contemplating that responsibilities remain

after Block has prepared and filed tax forms.

information, are appropriate for each customer. In this case, Block allegedly knew that Rapid Refund services would not work for Peterson because she was claiming an earned income credit. But instead of being truthful, Block used its discretion and superior knowledge to keep this information from her.

■ Likewise, Block's alleged actions show bad faith. Its concealment was allegedly deliberate, done with the improper motive of defrauding Peterson by charging her for a service she could not obtain. "Where a party acts with improper motive ... that party is exercising contractual discretion in a manner inconsistent with the reasonable expectations of the parties and therefore is acting in bad faith." *Dayan*, 125 Ill.App.3d at 991, 81 Ill.Dec. at 170, 466 N.E.2d at 972; *see also Saunders v. Michigan Ave. Nat'l Bank*, 278 Ill.App.3d 307, 316, 214 Ill.Dec. 1036, 1044, 662 N.E.2d 602, 610 (1996) (improper motive is a "predominant theme" in bad faith cases). Rather than exercising its discretion reasonably, Block transgressed Peterson's reasonable expectation of receiving accurate tax advice by duping her into paying money for a service wholly unavailable to her. If proven, such conduct would unquestionably violate Block's duty of good faith and Fair dealing.

In sum, when we consider the obligation of good faith and fair dealing inherent in every contract, we conclude that Peterson has satisfied the generous federal pleading standards for breach of contract. Block's motion to dismiss is therefore denied as to Count I.

## II. Count V—Breach of Fiduciary Duty

In Count V, Peterson alleges that Block owed her a fiduciary duty by virtue of its position as her tax adviser and accountant. Block allegedly abandoned·this duty because it fraudulently misrepresented that Rapid Refund services were available to taxpayers who claimed an EITC. Instead of putting its customers' interests first, Block allegedly worked only to advance its own interests—contrary to its fiduciary duty. Block responds that the Court should dismiss Count V because 1) Block's affiliation with Peterson does not fit any of the traditional fiduciary models, including an agency relationship; 2) its relation to her as a tax preparer (and assuming the truth of Peterson's allegations) advisor or accountant does not give rise to fiduciary duties; 3) Peterson does not plead facts sufficient to establish any other fiduciary relationship; and 4) even assuming that Block owed Peterson a fiduciary duty, the alleged wrongs fall outside the scope of that duty.

■ "A fiduciary duty is the duty of an agent to treat his principal with the utmost candor, rectitude, care, loyalty, and good faith—in fact to treat the principal as well as the agent would treat himself" *Lagen v. Balcor Co.*, 274 Ill.App.3d 11, 21, 210 Ill.Dec. 773, 780, 653 N.E.2d 968, 975 (1995). Although courts may find a fiduciary relationship when one person solicits another to repose trust in his expertise, "[t]he fact that one party trusts the other is insufficient [to create a fiduciary relationship]. We trust most people with whom we choose to do business." *Id.* The "essence" of a fiduciary relationship is one party's dominance over the other. *Id.* "Indeed, in the absence of dominance and influence there is no fiduciary relationships regardless of the level of trust between the parties." *Id.* (citations omitted). Significantly, a "slightly dominant business position ... [does] not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship." *Id.* (citations and internal quotations omitted). Courts therefore will not impose fiduciary duties absent a "significant degree of dominance and superiority of one party over another." *Id.*

Illinois courts recognize that these elements are manifested by nature in certain relationships, which they deem fiduciary as a matter of law. *See, e.g., Winston & Strawn v. Nosal*, 279 Ill.App.3d 231, 239, 215 Ill.Dec. 842, 847–48, 664 N.E.2d 239, 244–45 (1996) (partners); *Newton v. Aitken*, 260 Ill.App.3d 717, 722, 198 Ill.Dec. 751, 756, 633 N.E.2d 213, 218 (1994) (joint venturers); *Lossman v. Lossman*, 274 Ill.App.3d 1, 7, 210 Ill.Dec. 818, 824, 653 N.E.2d 1280, 1286 (1995) (attorney and client); *Matter of Estate of Dyniewicz*, 271 Ill.App.3d 616, 622, 208 Ill.Dec. 154, 159, 648 N.E.2d 1076, 1081 (1995) (guardian and ward); *Smith v. First Nat. Bank of*

*Danville,* 254 Ill.App.3d 251, 261, 191 Ill.Dec. 711, 719, 624 N.E.2d 899, 907 (1993) (trustee and beneficiary); *Kurtz v. Solomon,* 275 Ill. App.3d 643, 651, 212 Ill.Dec. 31, 37, 656 N.E.2d 184, 190 (1st Dist.1995) (agent and principal). Peterson's first argument in support of her fiduciary claim is that Block owed her fiduciary duties as a matter of law by agreeing to act as her agent.

## A. Block Was Not Peterson's Agent

An agency relationship has two components: 1) the principal has the right to control the manner and method in which the agent performs work for her, and 2) the agent has the power·to subject the principal to personal liability. *Knapp v. Hill,* 276 Ill.App.3d 376, 380, 212 Ill.Dec. 723, 726, 657 N.E.2d 1068, 1071 (1995). To form an agency, the parties need not use the word "agent" nor characterize their relationship as principal-agent. *RTC v. Hardisty,* 269 Ill.App.3d 613, 619, 207 Ill.Dec. 62, 66–67, 646 N.E.2d 628, 632–33 (1995). Their actions need only demonstrate a desire to create an agency relationship, for example, through a previous course of dealing that is sanctioned or ratified by the principal. *Id.* at 67, 646 N.E.2d at 633. "Once an agency relationship is found, a fiduciary relationship arises as a matter of law." *Letsos v. Century 21—New West Realty,* 285 Ill.App.3d 1056, 1064, 221 Ill.Dec. 310, 317, 675 N.E.2d 217, 224 (1996).

Peterson and Block's relationship fails the first and most critical element. The "key consideration" in determining whether an agency relationship exists is whether the principal had the right to control the "manner and method" in which the agent performs work. *Knapp,* 276 Ill.App.3d at 380, 212 Ill.Dec. at 726, 657 N.E.2d at 1071. Although Peterson argues in her brief that Block's clients "direct[ed]" Block "regarding what returns to file and what information to put in the return," Pl. Br. at 9–10, the allegations in her complaint do not support this.

The most Peterson alleges is that she provided Block the information it needed to complete her tax return. From there, Block took over. It was Block who made the determination that Peterson was eligible for an EITC and, according to Service*Plus,* ensured that all of Peterson's income was reported, her adjustments and deductions claimed, and her credits and payments identified. Furthermore, Peterson's complaint indicates that it was Block who wielded complete control in determining, RAL eligibility. There is no allegation that Peterson instructed Block as to how it should go about preparing her return or assessing what services were available to her. Consequently, the complaint is devoid of facts demonstrating that Peterson controlled the "manner or method" in which Block performed its services.[11] Although the trier of fact most often answers whether particular facts giving rise to an agency relationship exist, "a plaintiff must still plead facts, which, if proved, could establish the existence of an agency relationship." *Knapp,* 276 Ill.App.3d at 382, 212 Ill.Dec. at 727, 657 N.E.2d at 1072. Peterson has not done so.

## B. No Other Fiduciary Relationship Exists

Unable to establish a fiduciary relationship as a matter of law, Peterson attempts to impose fiduciary duties on Block on an "ad hoc" basis, alleging that the particular tax advisor/accountant-client relationship between her and Block rendered Block her fiduciary.[12] *See Burdett v. Miller,* 957 F.2d 1375, 1381 (7th Cir.1992) (while investment advisor-advisee relationship is not fiduciary by law, "fiduciary duties are sometimes imposed on an ad hoc basis."). In support of her position, Peterson cites a plethora of cases, only two of which were decided in this circuit and/or based on Illinois law, where courts held that the facts before them warranted attributing fiduciary status to a tax advisor or accountant. *See, e.g., Burdett,* 957

---

**11.** Because Peterson's agency claim fails the first element, we express no opinion as to whether Peterson satisfies the second, i.e., whether Block had the power to subject her to personal liability.

**12.** At the present time, Illinois courts do not consider the tax advisor-client relationship fidu-

ciary as a matter of law. *See Congregation of the Passion v. Touche Ross & Co.,* 224 Ill.App.3d 559, 590, 166 Ill.Dec. 642, 663, 586 N.E.2d 600, 621 (1991) *aff'd,* 159 Ill.2d 137, 201 Ill.Dec. 71, 636 N.E.2d 503 (1994).

F.2d 1375; *Terrell v. Childers*, 920 F.Supp. 854 (N.D.Ill.1996).

But these cases do not assist Peterson because in each, the defendants did far more than simply provide basic tax advice on an isolated basis. The courts' decisions to impose fiduciary duties were all premised on the parties' long-term, ongoing relationships, as well as the defendants' roles in managing assets, rendering complex investment advice and/or performing audits. For example, in *Burdett* the Seventh Circuit held a financial advisor liable to his investor for breach of fiduciary duty where the advisor, in addition to preparing the investor's income tax returns, recommended a number of investments over several years and rendered advice on a series of tax shelters. *Burdett*, 957 F.2d at 1378–79. The court emphasized that the parties "cultivated a relation of trust . . . over a period of years," and that the defendant induced the plaintiff "to accept his advice with no questions asked or answered." *Id.* at 1381–82. Likewise, in *Terrell*, the court concluded that a genuine issue of fact existed as to whether the defendant, a tax planning expert retained for several years to provide budget advice and preparation, tax advice and planning, insurance and estate planning, as well as to manage the plaintiff's assets, owed a fiduciary duty to his client. *Terrell*, 920 F.Supp. at 857.

■ The facts before us are vastly different: Block has no close, long-term relationship with Peterson or influence over the management and investment of her assets. Unlike the sophisticated financial advisor in *Burdett* and the tax planning expert in *Terrell*, Block is alleged to have done nothing more than perform a basic accounting function—preparing tax returns and advising its customers on the process. "Where an accountant merely performs basic accounting functions, no fiduciary relationship is created." *Fleet Nat'l Bank v. H & D Entertainment, Inc.*, 926 F.Supp. 226, 242 (D.Mass. 1996), *aff'd*, 96 F.3d 532 (1st Cir.1996). Indeed, to render an accountant liable as a fiduciary, the plaintiff must allege that he either provided investment advice, recommended complex financial transactions, structured deals, *see id.*, or performed audits, *see*,

*e.g., In re DeLorean Motor Co.*, 56 B.R. 936 (Bankr.E.D.Mich.1986), none of which Peterson claims Block did here. Moreover, Peterson did not have to accept Block's advice blindly. Block expressly offered her the opportunity, via the Service*Plus* pamphlet, to ask questions, a factor whose absence the Seventh Circuit found significant in *Burdett*. The sharp distinctions between these cases and the one before us prevent Peterson from resting her ad hoc fiduciary duty claim on this authority.

Aside from the defeating factual distinctions in her cited case law, Peterson fails to plead the "essence" of a fiduciary duty claim. Peterson is required to plead that Block had "a significant degree of dominance and superiority" over her, a standard her complaint does not meet. *See Lagen*, 274 Ill.App.3d at 21, 210 Ill.Dec. at 780, 653 N.E.2d at 975. Peterson claims that she trusted in Block's "superior knowledge, help, and guidance" in filing her tax return and dispensing RAL advice; however, nothing in these allegations shows significant dominance. Her relationship with Block was limited to an arms-length, isolated transaction for tax preparation services and basic tax advice; Block did not retain continuing control or influence over Peterson's assets, was in no position to stake large sums of her money in risky venture, nor had unquestioning control over her financial portfolio. The fact that she trusted Block is simply not enough, *see id.*, especially when she had the opportunity to ask questions about the process. In short, Peterson and Block's relationship was merely contractual, not fiduciary. Although Block was somewhat dominant, given that Peterson lacked sophistication in tax matters and yielded control over preparing her return, a "slightly dominant business position . . . [does] not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship." *Id;* see *Pottinger*, 238 Ill. App.3d at 918, 179 Ill.Dec. at 124, 605 N.E.2d at 1138 ("[W]e do not consider the existence of a contractual relationship . . ., without more, to support a finding that a fiduciary relationship in fact existed."). We find that her allegations fall short of pleading an ad hoc fiduciary relationship.

We acknowledge that Block is alleged to be a commercially successful and well-known expert on tax matters and the world's largest provider of tax services to United States taxpayers. But no case in Illinois or anywhere else holds that every expert is *ipso facto* a fiduciary. If this were so, every business that specializes in a particular type of service would be the fiduciary of its customers. And making Block a fiduciary to all of its customers would produce absurd results given that Block allegedly assists in filing one in every seven federal income tax returns. *See* Amd. Cmplt. Ex. B (H & R Block Report to Stockholders for Year Ending 4/30/95 at *14). The deterrent effect of saddling Block with fiduciary obligations could easily leave taxpayers without the firm's valuable services altogether.

After considering all of Peterson's arguments, we find that the complaint, as it stands, pleads neither an agency relationship nor any other fiduciary affiliation with Block. Because we accept Block's argument that no fiduciary relationship exists, we need not address its alternative argument that the facts alleged fall outside the scope of Block's fiduciary duty. Accordingly, we dismiss Count V without prejudice.[13]

### CONCLUSION

For the reasons stated above, Block's motion to dismiss is granted in part and denied in part. It is granted as to Count V and denied as to Count I.

---

13. The dismissal of Count V is without prejudice in case further facts learned in discovery justify the future repleading of this count in a manner consistent with this opinion.